# MOSES H. CONE MEMORIAL HOSPITAL *v*. MERCURY CONSTRUCTION CORP.

No. 81–1203.   Argued November 2, 1982—Decided February 23, 1983

1

2

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and O'CONNOR, J., joined, *post*, p. 30.

*Jack W. Floyd* argued the cause for petitioner. With him on the briefs were *Stephen P. Millikin* and *Douglas W. Ey, Jr.*

*A. H. Gaede, Jr.*, argued the cause for respondent. With him on the brief were *Joseph B. Mays, Jr., Charles Nichols,* and *Frank H. McFadden.*

JUSTICE BRENNAN delivered the opinion of the Court.

This case, commenced as a petition for an order to compel arbitration under § 4 of the United States Arbitration Act of 1925 (Arbitration Act or Act), 9 U. S. C. § 4, presents the question whether, in light of the policies of the Act and of our decisions in *Colorado River Water Conservation District* v. *United States,* 424 U. S. 800 (1976), and *Will* v. *Calvert Fire Insurance Co.,* 437 U. S. 655 (1978), the District Court for the Middle District of North Carolina properly stayed this diversity action pending resolution of a concurrent state-court suit. The Court of Appeals for the Fourth Circuit reversed the stay. 656 F. 2d 933, rehearing denied, 664 F. 2d 936 (1981). We granted certiorari. 455 U. S. 937 (1982). We affirm.

I

Petitioner Moses H. Cone Memorial Hospital (Hospital) is located in Greensboro, N. C. Respondent Mercury Construction Corp. (Mercury), a construction contractor, has its principal place of business in Alabama. In July 1975, Mercury and the Hospital entered into a contract for the construction of additions to the Hospital building. The contract, drafted by representatives of the Hospital, included provisions for resolving disputes arising out of the contract or its breach. All disputes involving interpretation of the contract or performance of the construction work were to be referred in the first instance to J. N. Pease Associates (Architect), an independent architectural firm hired by the Hospital to design and oversee the construction project. With certain

stated exceptions,[1] any dispute decided by the Architect (or not decided by it within a stated time) could be submitted by either party to binding arbitration under a broad arbitration clause in the contract:

> "All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof, . . . shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." App. 29–30.

The contract also specified the time limits for arbitration demands.[2]

Construction on the project began in July 1975. Performance was to be completed by October 1979.[3] In fact, construction was substantially completed in February 1979, and final inspections were made that June.

---

[1] The Architect was given final say on "matters relating to artistic effect." App. 28–29. The contract also excluded arbitration on any claim waived by the making or acceptance of final payment. *Id.*, at 29. Neither of these exceptions is asserted to apply in this case.

[2] The contract provided that no demand for arbitration could be made later than 30 days after the Architect's written final decision. In the case of arbitrable disputes not subject to submission to the Architect, the demand was required to be made "within a reasonable time after the claim . . . has arisen," and in no event after the applicable statute of limitations had run. *Id.*, at 29–30.

The contract also set a starting time limit for arbitration demands. No demand could be made earlier than 10 days after presentation of evidence to the Architect, unless the Architect rendered a written decision before that time. *Id.*, at 29.

[3] The completion date, originally set as November 14, 1978, was extended to October 1979 by agreement of the parties.

At a meeting in October 1977 (during construction), attended by representatives of Mercury, the Hospital, and the Architect, Mercury agreed, at the Architect's request, to withhold its claims for delay and impact costs (*i. e.*, claims for extended overhead or increase in construction costs due to delay or inaction by the Hospital) until the work was substantially completed. On this record, the Hospital does not contest the existence of this agreement, although it asserts that the Architect lacked authority to agree to a delay in presentation of claims or to entertain claims after the contract work was completed.

In January 1980, Mercury submitted to the Architect its claims for delay and impact costs. Mercury and the Architect discussed the claims over several months, substantially reducing the amount of the claims. According to the Hospital, it first learned of the existence of Mercury's claims in April 1980; its lawyers assumed active participation in the claim procedure in May. The parties differ in their characterizations of the events of the next few months—whether there were "ongoing negotiations," or merely an "investigation" by the Hospital. In any event, it appears from the record that lawyers for the Hospital requested additional information concerning Mercury's claims. As a result, on August 12, 1980, Mercury gave a detailed presentation of its claims at a meeting attended by Mercury's representatives and lawyers, the Hospital's representatives and lawyers, and representatives of the Architect. Mercury agreed to send copies of its files to an expert hired by the Hospital, and the parties agreed to meet again on October 13.

On October 6, Mercury's counsel telephoned the Hospital's counsel to confirm that the scheduled meeting would go forward. The Hospital's counsel said he would call back the next day. When he did, he informed Mercury's counsel that the Hospital would pay nothing on Mercury's claim. He also said that the Hospital intended to file a declaratory judgment action in North Carolina state court.

True to its word, the Hospital filed an action on the morning of October 8 in the Superior Court of Guilford County, N. C., naming Mercury and the Architect as defendants. The complaint alleged that Mercury's claim was without factual or legal basis and that it was barred by the statute of limitations. It alleged that Mercury had lost any right to arbitration under the contract due to waiver, laches, estoppel, and failure to make a timely demand for arbitration. The complaint also alleged various delinquencies on the part of the Architect. As relief, the Hospital sought a declaration that there was no right to arbitration; a stay of arbitration; a declaration that the Hospital bore no liability to Mercury; and a declaration that if the Hospital should be found liable in any respect to Mercury, it would be entitled to indemnity from the Architect. The complaint was served on Mercury on October 9. On that same day, Mercury's counsel mailed a demand for arbitration.

On October 15, without notice to Mercury, the Hospital obtained an *ex parte* injunction from the state court forbidding Mercury to take any steps directed toward arbitration. Mercury objected, and the stay was dissolved on October 27. As soon as the stay was lifted, Mercury filed the present action in the District Court, seeking an order compelling arbitration under § 4 of the Arbitration Act, 9 U. S. C. § 4.[4] Jurisdiction was based on diversity of citizenship. On the Hospital's motion, the District Court stayed Mercury's federal-court suit pending resolution of the state-court suit because the two suits involved the identical issue of the arbitrability of Mercury's claims. App. to Pet. for Cert. A–38.

---

[4] Simultaneously, Mercury filed a petition for removal of the Hospital's state-court action. The District Court remanded the removed case on the ground that, because the Hospital and the Architect are both North Carolina corporations, there was no complete diversity. The propriety of the removal or remand is not before this Court.

Mercury sought review of the District Court's stay by both a notice of appeal and a petition for mandamus. A panel of the Court of Appeals for the Fourth Circuit heard argument in the case, but before the panel issued any decision, the court informed the parties that it would consider the case en banc. After reargument, the en banc court held that it had appellate jurisdiction over the case under 28 U. S. C. § 1291. It reversed the District Court's stay order and remanded the case to the District Court with instructions for entry of an order to arbitrate.

## II

Before we address the propriety of the District Judge's stay order, we must first decide whether that order was appealable to the Court of Appeals under 28 U. S. C. § 1291.[5]

Mercury sought appellate review through two alternative routes—a notice of appeal under § 1291, and a petition for mandamus under the All Writs Act, 28 U. S. C. § 1651.[6] Mercury expressly stated that its appeal was based only on § 1291, and not on 28 U. S. C. § 1292 (relating to interlocutory appeals). The Hospital contends that the order appealed from was not a "final decisio[n]" within § 1291. We

---

[5] Section 1291 provides in relevant part:

"The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, . . . except where a direct review may be had in the Supreme Court."

[6] The Hospital argues that because Mercury's filing in the Court of Appeals was styled a petition for mandamus first and a notice of appeal only "in the alternative," the Hospital was somehow entitled to have the Court of Appeals apply the stricter standards of review that obtain under the mandamus procedure before considering any appeal. Brief for Petitioner 30–31. We do not understand why this order of proceeding would be of any benefit to the Hospital; but in any event the contention is frivolous. In the first place, Mercury also filed a proper notice of appeal in the District Court, see Fed. Rule App. Proc. 3(a). More fundamentally, a court of appeals has no occasion to engage in extraordinary review by mandamus "in aid of [its] jurisdictio[n]," 28 U. S. C. § 1651, when it can exercise the same review by a contemporaneous ordinary appeal. See, *e. g.*, *Hines* v. *D'Artois*, 531 F. 2d 726, 732, and n. 10 (CA5 1976).

disagree and hold that the stay order was final for purposes of appellate jurisdiction.

*Idlewild Liquor Corp.* v. *Epstein,* 370 U. S. 713 (1962), is instructive in this regard. There the plaintiff brought a federal suit challenging the constitutionality of a state statute. The District Judge declined to convene a three-judge court and stayed the federal suit under the *Pullman* abstention doctrine.[7] We held that the District Court's action was final and therefore reviewable by the Court of Appeals, stating:

> "The Court of Appeals properly rejected the argument that the order of the District Court 'was not final and hence unappealable under 28 U. S. C. §§ 1291, 1292,' pointing out that '[a]ppellant was effectively out of court.'" 370 U. S., at 715, n. 2.[8]

---

[7] *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941).

[8] The plaintiff in *Idlewild* had requested injunctive relief against enforcement of the state statute. Nevertheless, it is clear that neither the Court of Appeals nor this Court based the holding of appealability on the argument that the District Court had effectively denied injunctive relief. See generally 28 U. S. C. § 1292(a)(1); *Carson* v. *American Brands, Inc.,* 450 U. S. 79 (1981). Section 1292 in terms applies only to *interlocutory* orders, and therefore could hardly have been the basis for a holding that the orders were "final."

There is no basis for the dissent's attempt, *post,* at 33, to distinguish *Idlewild* on the basis that in that case there was no pending state-court action when the District Court's stay issued. Neither the Court of Appeals nor this Court suggested in *Idlewild* that the state court's doors were anything but wide open to the plaintiff. "[E]ffectively out of court" means effectively out of *federal* court—in keeping with the fact that the decision under appeal is the refusal to exercise *federal* jurisdiction.

Moreover, the dissent's resolution of the appealability issue would yield the odd result that *Pullman* abstention orders would be immediately appealable in Texas but not in the other 49 States. Compare *American Trial Lawyers Assn.* v. *New Jersey Supreme Court,* 409 U. S. 467 (1973) (stays appropriate in *Pullman* cases), with *Harris County Commissioners Court* v. *Moore,* 420 U. S. 77, 88–89, and n. 14 (1975) (dismissal permissible to accommodate Texas jurisdictional requirements). This oddity illustrates the artificiality of resting appealability on an otherwise substanceless distinction between stays and dismissals in the present context. See Part IV–E, *infra.*

Here, the argument for finality of the District Court's order is even clearer. A district court stay pursuant to *Pullman* abstention is entered with the expectation that the federal litigation will resume in the event that the plaintiff does not obtain relief in state court on state-law grounds.[9] Here, by contrast, the District Court predicated its stay order on its conclusion that the federal and state actions involved "the identical issue of arbitrability of the claims of Mercury Construction Corp. against the Moses H. Cone Memorial Hospital." App. to Pet. for Cert. A–38. That issue of arbitrability was the only substantive issue present in the federal suit. Hence, a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata.[10] Thus, here, even more surely than in *Idlewild*, Mercury was "effectively out of court." Hence, as the Court of Appeals held, this stay order amounts to a dismissal of the suit.[11]

---

[9] See *England* v. *Louisiana Bd. of Medical Examiners*, 375 U. S. 411 (1964).

[10] See, *e. g.*, *Ultracashmere House, Ltd.* v. *Meyer*, 664 F. 2d 1176, 1183–1184 (CA11 1981); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Haydu*, 637 F. 2d 391, 397–398 (CA5 1981).

[11] See 656 F. 2d 933, 937–938, and n. 6 (CA4 1981), citing as dispositive *Amdur* v. *Lizars*, 372 F. 2d 103, 105–106 (CA4 1967). See also *Federman* v. *Empire Fire & Marine Insurance Co.*, 597 F. 2d 798, 808, and n. 15 (CA2 1979); *Baltimore Bank for Cooperatives* v. *Farmers Cheese Cooperative*, 583 F. 2d 104, 108–109 (CA3 1978); *Sun Oil Co.* v. *FEA*, 572 F. 2d 867 (Temp. Emerg. Ct. App. 1978); *Rancho Palos Verdes Corp.* v. *Laguna Beach*, 547 F. 2d 1092, 1093, n. 1 (CA9 1976); *Hines* v. *D'Artois, supra*, at 730–732; *Drexler* v. *Southwest Dubois School Corp.*, 504 F. 2d 836, 838 (CA7 1974) (en banc); *Druker* v. *Sullivan*, 458 F. 2d 1272, 1274, n. 3 (CA1 1972). But see *Acton Corp.* v. *Borden, Inc.*, 670 F. 2d 377, 380–382 (CA1 1982); *State Farm Mutual Automobile Insurance Co.* v. *Scholes*, 601 F. 2d 1151, 1153–1154 (CA10 1979); *Frederick L.* v. *Thomas*, 578 F. 2d 513, 515–516 (CA3 1978) (dictum).

Of course, as these cases recognize, *Idlewild* does not disturb the usual rule that a stay is not ordinarily a final decision for purposes of § 1291, since

In any event, if the District Court order were not final for appealability purposes, it would nevertheless be appealable within the exception to the finality rule under *Cohen* v. *Beneficial Loan Corp.*, 337 U. S. 541 (1949). The factors required to show finality under this exception have been summarized as follows:

"To come within the 'small class' of decisions excepted from the final-judgment rule by *Cohen*, the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal

most stays do not put the plaintiff "effectively out of court." See, *e. g.*, *Amdur, supra,* at 105–106. *Idlewild*'s reasoning is limited to cases where (under *Colorado River*, abstention, or a closely similar doctrine) the object of the stay is to require all or an essential part of the federal suit to be litigated in a state forum.

This answers the dissent's argument, *post*, at 33–34, that *Idlewild* was overruled by that part of *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 469–477 (1978), which rejected the "death knell" doctrine of appealability. The "death knell" doctrine rested on the argument that in some situations an interlocutory decision (such as a refusal to certify a class) might terminate a suit as a practical matter because the named plaintiff would lack an economic incentive to pursue his individual claim. In a "death knell" case, however, the order sought to be appealed had no *legal* effect on the named plaintiff's ability to proceed with his individual claim in federal court. There is an obvious difference between a case in which the plaintiff himself *may choose* not to proceed, and a case in which the district court *refuses to allow* the plaintiff to litigate his claim in federal court. Appeal from a stay on abstention or *Colorado River* grounds, therefore, presents no prospect of "appeals of right from nonfinal orders that turn on the facts of a particular case," as in *Coopers & Lybrand, supra,* at 476. We foresee no great difficulty in determining when a district court has surrendered jurisdiction over a federal lawsuit.

For much the same reason, the dissent errs in likening the stay in this case to an ordinary delay in the interest of docket control, *post*, at 30–31. We do not hold that an order becomes final merely because it may have the practical effect of allowing a state court to be the first to rule on a common issue. We hold only that a stay order is final when the sole purpose and effect of the stay are precisely to surrender jurisdiction of a federal suit to a state court.

from a final judgment." *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 468 (1978) (footnote omitted).[12]

There can be no dispute that this order meets the second and third of these criteria. An order that amounts to a refusal to adjudicate the merits plainly presents an important issue separate from the merits.[13] For the same reason, this order would be entirely unreviewable if not appealed now. Once the state court decided the issue of arbitrability, the federal court would be bound to honor that determination as res judicata.

The Hospital contends nevertheless that the District Court's stay order did not meet the first of the criteria, namely that it "conclusively determine the disputed question." But this is true only in the technical sense that every order short of a final decree is subject to reopening at the discretion of the district judge.[14] In this case, however, there is

---

[12] Accord, *Firestone Tire & Rubber Co.* v. *Risjord,* 449 U. S. 368, 375 (1981); *United States* v. *MacDonald,* 435 U. S. 850, 854–855 (1978); *Abney* v. *United States,* 431 U. S. 651, 658–659 (1977).

[13] The "completely separate from the merits" requirement is a distillation of the principle that there should not be piecemeal review of "steps towards final judgment in which they will merge." *Cohen* v. *Beneficial Loan Corp.*, 337 U. S. 541, 546 (1949). In this case, of course, there is no step towards final judgment, but a refusal to proceed at all.

[14] See Fed. Rule Civ. Proc. 54(b); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4478, pp. 788–792 (1981).

*Coopers & Lybrand* held that the *Cohen* rule did not apply to a class decertification order because, among other reasons, such an order is "inherently tentative" under Federal Rule of Civil Procedure 23(c)(1), which provides that such an order may be "altered or amended before the decision on the merits." 437 U. S., at 469, and n. 11. Of course, as Rule 54(b) provides, virtually all interlocutory orders may be altered or amended before final judgment if sufficient cause is shown; yet that does not make all pretrial orders "inherently tentative" in the sense of that phrase in *Coopers & Lybrand.* The rationale behind Rule 23(c)(1) is that a certification decision should be made "[a]s soon as practicable," even though later events or discoveries may mandate a different result. Many other orders, by contrast, are made with the expectation that they will be the final word on the sub-

no basis to suppose that the District Judge contemplated any reconsideration of his decision to defer to the parallel state-court suit. He surely would not have made that decision in the first instance unless he had expected the state court to resolve all relevant issues adequately. See Part IV–E, *infra.* It is not clear why the judge chose to stay the case rather than to dismiss it outright; for all that the record shows, there was no reason other than the form of the Hospital's motion. Whatever the reason, however, the practical effect of his order was entirely the same for present purposes, and the order was appealable.

## III

We turn now to the principal issue to be addressed, namely, the propriety of the District Court's decision to stay this federal suit out of deference to the parallel litigation brought in state court. *Colorado River Water Conservation District* v. *United States,* 424 U. S. 800 (1976), provides persuasive guidance in deciding this question.

## A

*Colorado River* involved the effect of the McCarran Amendment, 66 Stat. 560, 43 U. S. C. § 666, on the existence and exercise of federal-court jurisdiction to adjudicate federal water rights, 28 U. S. C. § 1345. The Amendment waives the Government's sovereign immunity to permit the joinder of the United States in some state-court suits for the adjudication of water rights. In *Colorado River,* however, the Government proceeded in Federal District Court, bringing suit against some 1,000 nonfederal water users, seeking a declaration of the water rights of certain federal entities and Indian tribes. Shortly thereafter, a defendant in that suit

---

ject addressed. Certainly that was true of the order at issue in this case. The reasoning of *Coopers & Lybrand* does not reach all pretrial orders that are formally subject to revision, but only those as to which some revision might reasonably be expected in the ordinary course of litigation.

sought to join the United States in a state-court proceeding for the comprehensive adjudication and administration of all water rights within the river system that was the subject of the federal-court suit. The District Court dismissed the federal suit, holding that the abstention doctrine required deference to the state-court proceedings. The Court of Appeals for the Tenth Circuit reversed, holding that the suit of the United States was within the District Court's jurisdiction under 28 U. S. C. § 1345 and that abstention was inappropriate. We reversed the judgment of the Court of Appeals and affirmed the judgment of the District Court dismissing the complaint.

We began our analysis by examining the abstention doctrine in its various forms. We noted:

> "Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.'" [15]

After canvassing the three categories of abstention, we concluded that none of them applied to the case at hand. 424 U. S., at 813–817. [16]

Nevertheless, we held that the District Court's dismissal was proper on another ground—one resting not on considerations of state-federal comity or on avoidance of constitu-

---

[15] 424 U. S., at 813, quoting *County of Allegheny* v. *Frank Mashuda Co.*, 360 U. S. 185, 188–189 (1959).

[16] There is no contention here that any of the categories of the abstention doctrine apply to this case.

tional decisions, as does abstention, but on "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'"[17] We noted that "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction,'" and that the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."[18] We continued:

"Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist." *Id.*, at 818.

We declined to prescribe a hard-and-fast rule for dismissals of this type, but instead described some of the factors relevant to the decision.

"It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts. . . . In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise juris-

---

[17] 424 U. S., at 817, quoting *Kerotest Mfg. Co.* v. *C-O-Two Fire Equipment Co.*, 342 U. S. 180, 183 (1952).

[18] 424 U. S., at 817, quoting *McClellan* v. *Carland*, 217 U. S. 268, 282 (1910).

diction and the combination of factors counselling against that exercise is required. *Only the clearest of justifications will warrant dismissal." Id.*, at 818–819 (emphasis added; citations omitted).

As this passage makes clear, the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case. *Colorado River* itself illustrates this principle in operation. By far the most important factor in our decision to approve the dismissal there was the "clear federal policy . . . [of] avoidance of piecemeal adjudication of water rights in a river system," *id.*, at 819, as evinced in the McCarran Amendment. We recognized that the Amendment represents Congress' judgment that the field of water rights is one peculiarly appropriate for comprehensive treatment in the forums having the greatest experience and expertise, assisted by state administrative officers acting under the state courts. *Id.*, at 819–820. In addition, we noted that other factors in the case tended to support dismissal— the absence of any substantial progress in the federal-court litigation; the presence in the suit of extensive rights governed by state law; the geographical inconvenience of the federal forum; and the Government's previous willingness to litigate similar suits in state court. *Id.*, at 820.

B

Before discussing the application of *Colorado River*'s exceptional-circumstances test, we must address the Hospital's argument that that test was undermined by our subsequent decision in *Will* v. *Calvert Fire Insurance Co.*, 437 U. S. 655 (1978). We find no merit in this argument for at least two reasons.

The Hospital relies on the opinion of JUSTICE REHNQUIST, announcing the judgment of the Court. The Hospital argues that JUSTICE REHNQUIST's opinion, if not expressly overruling *Colorado River*, at least modifies its holding substantially. But it is clear that a majority of the Court reaffirmed the *Colorado River* test in *Calvert*. JUSTICE REHNQUIST's opinion commanded only four votes. It was opposed by the dissenting opinion, in which four Justices concluded that the *Calvert* District Court's stay was impermissible under *Colorado River*. 437 U. S., at 668–669, 672–674 (BRENNAN, J., joined by BURGER, C. J., and MARSHALL and POWELL, JJ., dissenting). JUSTICE BLACKMUN, although concurring in the judgment, agreed with the dissent that *Colorado River*'s exceptional-circumstances test was controlling; he voted to remand to permit the District Court to apply the *Colorado River* factors in the first instance.[19] 437 U. S., at 667–668. On remand, the Court of Appeals correctly recognized that the four dissenting Justices and JUSTICE BLACKMUN formed a majority to require application of the *Colorado River* test. *Calvert Fire Insurance Co.* v. *Will*, 586 F. 2d 12 (CA7 1978).[20]

---

[19] Our decision in *Colorado River* came down after the District Court's stay order in *Calvert* but before the Court of Appeals issued its mandamus in that case.

[20] On remand from our decision in *Calvert*, the District Court and Court of Appeals concluded that the stay should be continued, but rested that decision on a ground not addressed in the prior Court of Appeals decision (*Calvert Fire Insurance Co.* v. *Will*, 560 F. 2d 792 (CA7 1977)) or in any of this Court's opinions in the case. They concluded that the filing of the federal suit was a "defensive tactical maneuver" based on a contrived federal claim; hence, a stay was called for as "a means to deter vexatious use of the federal courts." The courts also noted that, in the interim, the basis for the plaintiff's assertion of exclusive federal jurisdiction had vanished. *Calvert Fire Insurance Co.* v. *American Mutual Reinsurance Co.*, 600 F. 2d 1228, 1234–1236 (CA7 1979), aff'g 459 F. Supp. 859 (ND Ill. 1978). The case did not come before this Court for review a second time.

The Court of Appeals in this case relied on similar reasoning. It concluded that, despite chronological priority of filing, the Hospital's state-

Even on the basis of JUSTICE REHNQUIST's opinion, however, there is an obvious distinction between *Calvert* and this case.  The key to *Calvert* was the standard for issuance of a writ of mandamus under 28 U. S. C. § 1651.[21]  As JUSTICE REHNQUIST stressed, such extraordinary writs are used in aid of appellate jurisdiction only to confine an inferior court to a lawful exercise of its prescribed authority, or to compel it to exercise its authority when it is its duty to do so.  The movant must show that his right to the writ is clear and indisputable.  437 U. S., at 661–662, 664, 665–666 (opinion of REHNQUIST, J.).  JUSTICE REHNQUIST concluded that the movant in *Calvert* had failed to meet this burden.  At the same time, he noted that the movant might have succeeded on a proper appeal.  *Id.*, at 665.  In this case we have held that the Court of Appeals did have appellate jurisdiction; it properly exercised that jurisdiction to find that the District Court's stay was impermissible under *Colorado River*.

The Hospital further contends that *Calvert* requires reversal here because the opinions of JUSTICE REHNQUIST and

---

court suit was a contrived, defensive reaction to Mercury's expected claim for relief and for arbitration.  656 F. 2d, at 944–945.

The reasoning of the Courts of Appeals in this case and in *Calvert*—that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River*—has considerable merit.  We need not rely on such reasoning here, however, for we conclude *infra* that even if the Hospital acted in complete good faith there were no exceptional circumstances warranting the District Court's stay.

[21] The Court of Appeals in *Calvert* had held that it lacked jurisdiction to entertain an ordinary appeal, apparently because a portion of the federal litigation was the subject of exclusive federal jurisdiction and would therefore remain to be disposed of in federal court after the conclusion of state-court proceedings.  *Calvert Fire Insurance Co.* v. *Will*, 560 F. 2d, at 794, citing *Cotler* v. *Inter-County Orthopaedic Assn.*, 526 F. 2d 537, 540 (CA3 1975).  Cf. *Drexler* v. *Southwest Dubois School Corp.*, 504 F. 2d, at 838 (stay of litigation pending exhaustion of state remedies is final under *Idlewild*).  The issue of appellate jurisdiction was not presented to this Court in *Calvert*.

JUSTICE BLACKMUN require greater deference to the discretion of the District Court than was given by the Court of Appeals in this case. Under both *Calvert* and *Colorado River*, of course, the decision whether to defer to the state courts is necessarily left to the discretion of the district court in the first instance. Yet to say that the district court has discretion is not to say that its decision is unreviewable; such discretion must be exercised under the relevant standard prescribed by this Court. In this case, the relevant standard is *Colorado River*'s exceptional-circumstances test, as elucidated by the factors discussed in that case. As we shall now explain, we agree with the Court of Appeals that the District Court in this case abused its discretion in granting the stay.

## IV

Applying the *Colorado River* factors to this case, it is clear that there was no showing of the requisite exceptional circumstances to justify the District Court's stay.

The Hospital concedes that the first two factors mentioned in *Colorado River* are not present here. There was no assumption by either court of jurisdiction over any res or property, nor is there any contention that the federal forum was any less convenient to the parties than the state forum. The remaining factors—avoidance of piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums—far from supporting the stay, actually counsel against it.

## A

There is no force here to the consideration that was paramount in *Colorado River* itself—the danger of piecemeal litigation.

The Hospital points out that it has two substantive disputes here—one with Mercury, concerning Mercury's claim for delay and impact costs, and the other with the Architect, concerning the Hospital's claim for indemnity for any liability it may have to Mercury. The latter dispute cannot be sent

to arbitration without the Architect's consent, since there is no arbitration agreement between the Hospital and the Architect. It is true, therefore, that if Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve these related disputes in different forums. That misfortune, however, is not the result of any choice between the federal and state courts; it occurs because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement.[22] Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.[23] If the dispute between Mercury and the Hospital *is* arbitrable under the Act, then the Hospital's two disputes will be resolved separately—one in arbitration, and the other (if at all) in state-court litigation. Conversely, if the dispute between Mercury and the Hospital *is not* arbitrable, then both disputes will be resolved in state court. But neither of those two outcomes depends at all on *which court* decides the question of arbitrability. Hence, a decision to allow that issue to be decided in federal rather than state court does not cause piecemeal resolution of the parties' underlying disputes. Al-

---

[22] This provides a sharp contrast with the key statute at issue in *Colorado River*—the McCarran Amendment. There, as we stressed, the primary policy of the statute was the *avoidance* of piecemeal litigation. 424 U. S., at 819–820.

[23] *E. g., C. Itoh & Co.* v. *Jordan International Co.*, 552 F. 2d 1228, 1231–1232 (CA7 1977); *Acevedo Maldonado* v. *PPG Industries, Inc.*, 514 F. 2d 614, 617 (CA1 1975); *Hamilton Life Insurance Co.* v. *Republic National Life Insurance Co.*, 408 F. 2d 606, 609 (CA2 1969).

In some cases, of course, it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket. See generally *Landis* v. *North American Co.*, 299 U. S. 248, 254–255 (1936).

though the Hospital will have to litigate the arbitrability issue in federal rather than state court, that dispute is easily severable from the merits of the underlying disputes.

## B

The order in which the concurrent tribunals obtained and exercised jurisdiction cuts against, not for, the District Court's stay in this case. The Hospital argues that the stay was proper because the state-court suit was filed some 19 days before the federal suit. In the first place, this argument disregards the obvious reason for the Hospital's priority in filing. An indispensable element of Mercury's cause of action under § 4 for an arbitration order is the Hospital's refusal to arbitrate. See n. 27, *infra*. That refusal did not occur until less than a day before the Hospital filed its state suit. Hence, Mercury simply had no reasonable opportunity to file its § 4 petition first. Moreover, the Hospital succeeded in obtaining an *ex parte* injunction from the state court forbidding Mercury to take any steps to secure arbitration.[24] Mercury filed its § 4 petition the same day that the injunction was dissolved.[25]

That aside, the Hospital's priority argument gives too mechanical a reading to the "priority" element of the *Colorado River* balance. This factor, as with the other *Colorado River* factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. *Colorado River* illustrates

---

[24] Of course we do not mean to say that the state court's injunction could properly have been applied to prevent Mercury from filing or prosecuting a federal lawsuit. See *General Atomic Co.* v. *Felter*, 434 U. S. 12 (1977); *Donovan* v. *City of Dallas*, 377 U. S. 408 (1964). Mercury was not obliged, however, to put itself in danger of contempt sanctions merely in order to cut short the period of the Hospital's priority of filing.

[25] See also n. 20, *supra*.

this point well. There, the federal suit was actually filed first. Nevertheless, we pointed out as a factor favoring dismissal "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss." 424 U. S., at 820. Here, the opposite was true. It was the state-court suit in which no substantial proceedings (excepting only the abortive temporary injunction) had taken place at the time of the decision to stay. In the federal suit, by contrast, the parties had taken most of the steps necessary to a resolution of the arbitrability issue.[26] In realistic terms, the federal suit was running well ahead of the state suit at the very time that the District Court decided to refuse to adjudicate the case.

This refusal to proceed was plainly erroneous in view of Congress' clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible. The Act provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U. S. C. § 3, and an affirmative order to engage in arbitration, § 4. Both of these sections call for an expeditious and summary hearing, with only restricted inquiry into factual issues.[27] Assuming that the state court would

---

[26] Under § 6 of the Arbitration Act, 9 U. S. C. § 6, Mercury's application for a § 4 order was properly treated procedurally as a motion. Mercury submitted affidavits, legal briefs, and documentary evidence in support of the order sought. The Hospital responded with full briefing and extensive evidentiary submissions on the arbitrability issue, and it requested oral argument and a jury trial. At the same time, it made its successful motion for a stay. It is readily apparent that if the District Court had denied the stay, it doubtless could and should have gone on to decide the arbitrability point in very short order.

[27] Section 3 provides that if a suit is brought on the merits of a dispute covered by an arbitration agreement, "the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant

have granted prompt relief to Mercury under the Act,[28] there still would have been an inevitable delay as a result of the District Court's stay. The stay thus frustrated the statutory policy of rapid and unobstructed enforcement of arbitration agreements.

## C

Besides the four factors expressly discussed in *Colorado River*, there is another that emerges from *Calvert*—the fact that federal law provides the rule of decision on the merits. The state-versus-federal-law factor was of ambiguous relevance in *Colorado River*.[29] In *Calvert*, however, both the four-vote dissenting opinion and JUSTICE BLACKMUN's opinion concurring in the judgment pointed out that the case involved issues of federal law. 437 U. S., at 667 (BLACKMUN, J., concurring in judgment); *id.*, at 668–677 (BRENNAN, J.,

---

for the stay is not in default in proceeding with such arbitration." 9 U. S. C. § 3.

Section 4 provides that a district court must enter an order to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." If either of these points is in issue, § 4 provides that "the court shall proceed summarily" to a trial on that point. Section 6 further provides that a request for relief under either § 3 or § 4 is to be treated procedurally as a motion.

Moreover, the policy of the Arbitration Act requires a liberal reading of arbitration agreements, see *infra*, at 24–25. As a result, some issues that might be thought relevant to arbitrability are themselves arbitrable—further speeding the procedure under §§ 3 and 4. See, *e. g.*, *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395 (1967).

[28] See n. 34, *infra;* but cf. nn. 35, 36, *infra*.

[29] Although the dissenting Justices in *Colorado River* relied on this point, see 424 U. S., at 825–826, the majority concluded that the federal/state law point was not controlling for two reasons. First, there was an affirmative policy in federal law expressly approving litigation of federal water rights in state court—the McCarran Amendment. Second, although the water rights of the United States and the Indian tribes were governed in part by federal law, the bulk of the litigation would necessarily revolve around the state-law water rights of the thousand nonfederal parties in the case—a factor on which we expressly relied in approving the District Court's stay. *Id.*, at 820.

dissenting). See also *Colorado River*, 424 U. S., at 815, n. 21. It is equally apparent that this case involves federal issues.

The basic issue presented in Mercury's federal suit was the arbitrability of the dispute between Mercury and the Hospital. Federal law in the terms of the Arbitration Act governs that issue in either state or federal court. Section 2 is the primary substantive provision of the Act, declaring that a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. § 2.[30] Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. In *Prima Paint Corp.* v. *Flood & Conklin Mfg. Corp.*, 388 U. S. 395 (1967), for example, the parties had signed a contract containing an arbitration clause, but one party alleged that there had been fraud in the inducement of the entire contract (although the alleged fraud did not go to the arbitration clause in particular). The issue before us was whether the issue of fraud in the inducement was itself an arbitrable controversy. We held that the language and policies of the Act required the conclusion that the fraud issue was arbitrable. *Id.*, at 402–404. Although our holding in *Prima Paint* extended only to the specific issue presented, the Courts of Appeals have since consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues

---

[30] "Maritime transactions" and "commerce" are defined in § 1 of the Arbitration Act, 9 U. S. C. § 1.

should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.[31]

To be sure, the source-of-law factor has less significance here than in *Calvert*, since the federal courts' jurisdiction to enforce the Arbitration Act is concurrent with that of the state courts.[32] But we emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under *Colo-*

---

[31] *E. g., Dickinson* v. *Heinold Securities, Inc.*, 661 F. 2d 638, 643 (CA7 1981); *Wick* v. *Atlantic Marine, Inc.*, 605 F. 2d 166, 168 (CA5 1979); *Becker Autoradio U. S. A., Inc.* v. *Becker Autoradiowerk GmbH*, 585 F. 2d 39, 43–45 (CA3 1978); *Hanes Corp.* v. *Millard*, 174 U. S. App. D. C. 253, 266, 531 F. 2d 585, 598 (1976); *Acevedo Maldonado* v. *PPG Industries, Inc.*, 514 F. 2d, at 616–617; *Germany* v. *River Terminal R. Co.*, 477 F. 2d 546, 547 (CA6 1973); *Coenen* v. *R. W. Pressprich & Co.*, 453 F. 2d 1209, 1211–1212 (CA2 1972); *Hart* v. *Orion Insurance Co.*, 453 F. 2d 1358, 1360–1361 (CA10 1971).

[32] See n. 34, *infra*.

The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U. S. C. § 1331 (1976 ed., Supp. V) or otherwise. Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue. *E. g., Commercial Metals Co.* v. *Balfour, Guthrie, & Co.*, 577 F. 2d 264, 268–269 (CA5 1978), and cases cited. Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence. Nevertheless, although enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate.

We need not address whether a federal court might stay a state-court suit pending arbitration under 28 U. S. C. § 2283.

*rado River* to justify the *surrender* of that jurisdiction. Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender, see n. 29, *supra*, the presence of federal-law issues must always be a major consideration weighing against surrender.[33]

## D

Finally, in this case an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights. We are not to be understood to impeach the competence or procedures of the North Carolina courts. Moreover, state courts, as much as federal courts, are obliged to grant stays of litigation under § 3 of the Arbitration Act.[34] It is less clear, however, whether the same is true of an order to compel arbitration under § 4 of the Act.[35] We need not resolve that question here; it suffices to say that there was, at a minimum, substantial room for doubt that Mercury could obtain from the state court an order compel-

---

[33] Cf. n. 20, *supra*.

[34] Although § 3 refers ambiguously to a suit "in any of the courts of the United States," the state courts have almost unanimously recognized that the stay provision of § 3 applies to suits in state as well as federal courts, requiring them to issue the same speedy relief when a dispute is referable to arbitration. (The North Carolina Supreme Court has so held, although not until after the District Court ordered this stay. *Burke County Public Schools Board of Education* v. *Shaver Partnership*, 303 N. C. 408, 279 S. E. 2d 816 (1981).) This is necessary to carry out Congress' intent to mandate enforcement of all covered arbitration agreements; Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court. See also *Prima Paint*, 388 U. S., at 404.

[35] Section 4, unlike § 3, speaks only of a petition to "any United States district court." Nonetheless, at least one state court has held that § 4 does require state courts to issue § 4 orders to arbitrate where the section's conditions are met. *Main* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 67 Cal. App. 3d 19, 24–25, 136 Cal. Rptr. 378, 380–381 (1977).

ling the Hospital to arbitrate.[36]   In many cases, no doubt, a § 3 stay is quite adequate to protect the right to arbitration. But in a case such as this, where the party opposing arbitration is the one from whom payment or performance is sought, a stay of litigation alone is not enough.   It leaves the recalcitrant party free to sit and do nothing—neither to litigate nor to arbitrate.   If the state court stayed litigation pending arbitration but declined to compel the Hospital to arbitrate, Mercury would have no sure way to proceed with its claims except to return to federal court to obtain a § 4 order—a pointless and wasteful burden on the supposedly summary and speedy procedures prescribed by the Arbitration Act.

### E

The Hospital argues that the *Colorado River* test is somehow inapplicable because in this case the District Court merely stayed the federal litigation rather than dismissing the suit outright, as in *Colorado River*.   It contends that Mercury remains free to seek to reopen the federal suit on a showing that the state suit has failed to adjudicate its rights, and that a stay is less onerous than a dismissal.   We have already rejected this distinction, for purposes of this case, in discussing appellate jurisdiction.   *Supra*, at 12–13.   We reject it in this context for the same reasons.

---

[36] As a historical matter, there was considerable doubt at the time of the District Court's stay that the North Carolina court would have granted even a § 3 stay of litigation.   The then-controlling precedent in North Carolina was to the effect that a contract such as that between Mercury and the Hospital was not subject to the Arbitration Act at all, on the reasoning that a construction project is not "commerce" within the meaning of §§ 1 and 2 of the Act.   *Burke County Public Schools Board of Education* v. *Shaver Partnership*, 46 N. C. App. 573, 265 S. E. 2d 481 (1980); *Bryant-Durham Electric Co.* v. *Durham County Hospital Corp.*, 42 N. C. App. 351, 256 S. E. 2d 529 (1979).   The North Carolina Supreme Court has, however, since repudiated those decisions.   *Burke County Public Schools Board of Education* v. *Shaver Partnership*, 303 N. C. 408, 279 S. E. 2d 816 (1981).

We have no occasion in this case to decide whether a dismissal or a stay should ordinarily be the preferred course of action when a district court properly finds that *Colorado River* counsels in favor of deferring to a parallel state-court suit.[37] We can say, however, that a stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all. See Part IV–D, *supra; McNeese* v. *Board of Education*, 373 U. S. 668, 674–676 (1963). Thus, the decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses. See 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4247, pp. 517–519 (1978).

Moreover, assuming that for some unexpected reason the state forum does turn out to be inadequate in some respect, the Hospital's argument fails to make out any genuine difference between a stay and a dismissal. It is true that Mercury could seek to return to federal court if it proved necessary; but that would be equally true if the District Court had dismissed the case. It is highly questionable whether this Court would have approved a dismissal of a federal suit in *Colorado River* (or in any of the abstention cases, see *supra*, at 14) if the federal courts did not remain open to a dismissed plaintiff who later demonstrated the inadequacy of the state forum.

---

[37] This reservation, of course, applies only to cases under *Colorado River*. Cf., *e. g., American Trial Lawyers Assn.* v. *New Jersey Supreme Court*, 409 U. S. 467 (1973) (stay rather than dismissal in *Pullman* abstention).

## V

In addition to reversing the District Court's stay, the Court of Appeals decided that the underlying contractual dispute between Mercury and the Hospital is arbitrable under the Arbitration Act and the terms of the parties' arbitration agreement. It reversed the District Court's judgment and remanded the case "with directions to proceed in conformity herewith." 656 F. 2d, at 946. In effect, the Court of Appeals directed the District Court to enter a § 4 order to arbitrate.

In this Court, the Hospital does not contest the substantive correctness of the Court of Appeals' holding on arbitrability. It does raise several objections to the procedures the Court of Appeals used in considering and deciding this case. In particular, it points out that the only issue formally appealed to the Court of Appeals was the propriety of the District Court's stay order. Ordinarily, we would not expect the Court of Appeals to pass on issues not decided in the District Court. In the present case, however, we are not disposed to disturb the court's discretion in its handling of the case in view of the special interests at stake and the apparent lack of any prejudice to the parties. Title 28 U. S. C. § 2106 gives a court of appeals some latitude in entering an order to achieve justice in the circumstances. The Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses. The Court of Appeals had in the record full briefs and evidentiary submissions from both parties on the merits of arbitrability, and held that there were no disputed issues of fact requiring a jury trial before a § 4 order could issue. Under these circumstances, the court acted within its authority in deciding the legal issues presented in order to facilitate the prompt arbitration that Congress envisaged.

*Affirmed.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

In its zeal to provide arbitration for a party it thinks deserving, the Court has made an exception to established rules of procedure. The Court's attempt to cast the District Court's decision as a final judgment fails to do justice to the meaning of the word "final," to the Act of Congress that limits the jurisdiction of the courts of appeals, or to the district judges who administer the laws in the first instance.

If the District Court had not stayed the proceeding, but had set a trial date two months away, there would be no doubt that its order was interlocutory, subject to review only by mandamus or pursuant to 28 U. S. C. § 1292(b). This would be true even though § 4 of the Arbitration Act provides that "the court shall proceed summarily" to trial, because an order setting a trial date only guides the course of litigation, and does not, of its own force, dispose of it on the merits. Such an order is tentative; that is, it is subject to change at any time on the motion of a party or by the court, *sua sponte*.

The order the District Court actually entered is no more final. It delayed further proceedings until the completion of pending litigation in the state courts. This order was also tentative; it was subject to change on a showing that the state proceedings were being delayed, either by the Hospital or by the court, or that the state courts were not applying the federal Act, or that some other reason for a change had arisen. This order did not dispose of the case on the merits. If the state court had found that there was no agreement to arbitrate within the meaning of the United States Arbitration Act, the District Court would have been bound by that finding. But res judicata or collateral estoppel would apply if the state court reached a decision before the District Court in the absence of a stay. The likelihood that a state court of competent jurisdiction may enter a judgment that may determine some issue in a case does not render final a federal district court's decision to take a two-day recess, or to order ad-

ditional briefing by the parties in five days or five months, or to take a case under advisement rather than render an immediate decision from the bench. Such a possibility did not magically change that character of the order the District Judge entered in this case.

Section 1291 of the Judicial Code is a congressional command to the federal courts of appeals not to interfere with the district courts' management of ongoing proceedings. Unless the high standards for a writ of mandamus can be met, or the district court certifies an interlocutory appeal pursuant to § 1292(b), Congress has directed that the district courts be permitted to conduct their cases as they see fit. The reason for this rule is simple:

> "Since the right to a judgment from more than one court is a matter of grace and not a necessary ingredient of justice, Congress from the very beginning has, by forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy, set itself against enfeebling judicial administration. Thereby is avoided the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment. To be effective, judicial administration must not be leaden-footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause." *Cobbledick* v. *United States*, 309 U. S. 323, 325 (1940) (Frankfurter, J., for a unanimous Court).

The Court's decision places an unwarranted limitation upon the power of district courts to control their own cases. The Court's opinion does not establish a broad exception to § 1291, see *ante*, at 10–11, n. 11, but it does create uncertainty about when a district court order in a pending case can be appealed. This uncertainty gives litigants opportunities to disrupt or delay proceedings by taking colorable appeals from interlocu-

tory orders, not only in cases nearly identical to this but also in cases which the ingenuity of counsel disappointed by a district court's ruling can analogize to this one. Section 1291 established a policy that district judges should conduct their own cases from beginning to end. The occasional injustice to a litigant that results from an erroneous district court decision is far outweighed by the far greater systemic disruption created by encouraging parties to attempt interlocutory appeals. The former attracts the Court's attention because the legal error it perceives is apparent on the surface of the case. The latter receives inadequate attention because it does not appear in published decisions or in petitions for certiorari. It is, rather, obscured by the "merits" of cases and hidden among statistics on the cost and seeming interminable nature of litigation. Both respect for district judges and concern for the course of litigation generally should make the Court hesitate before creating another exception, however narrow, to § 1291.

The Court has acknowledged the importance of the rule of finality as recently as *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463 (1978), which rejected the so called "death knell" exception to § 1291. In *Coopers*, a putative representative plaintiff whose motion for class certification had been denied by the District Court sought to appeal under § 1291. We accepted his argument that this order effectively put him out of court, *id.*, at 470, but held that this circumstance did not justify an exception to the statute. "[A]llowing appeals of right from nonfinal orders that turn on the facts of a particular case thrusts appellate courts indiscriminately into the trial process and thus defeats one vital purpose of the final-judgment rule—'that of maintaining the appropriate relationship between the respective courts. . . . This goal, in the absence of most compelling reasons to the contrary, is very much worth preserving.'" *Id.*, at 476 (quoting *Parkinson* v. *April Industries, Inc.*, 520 F. 2d 650, 654 (CA2 1975) (concurring opinion)).

The Court has not given any sound, principled justification for permitting the Court of Appeals to thrust itself into the trial process in this case. It begins by citing *Idlewild Liquor Corp.* v. *Epstein*, 370 U. S. 713 (1962). There the District Court had stayed an action challenging the constitutionality of a state statute "to give the state courts an opportunity to pass upon the constitutional issues presented, although there was no relevant litigation then pending in the state courts." *Id.*, at 714. This Court held that the order was appealable because the plaintiff "was effectively out of court." *Id.*, at 715, n. 2. *Idlewild* does not control this case.

First, Mercury is less "effectively out of court" than was Idlewild. There was no pending state proceeding that might have resolved the issues in the case, and Idlewild might well have been obliged to take the risk of violating the statute and challenging it in an enforcement proceeding in state court.

More importantly, however, the decision in *Idlewild* cannot be good law after *Coopers, supra.* The Court describes *Coopers* as holding only that the collateral-order doctrine of *Cohen* v. *Beneficial Loan Corp.*, 337 U. S. 541 (1949), does not apply to a class decertification order under Federal Rule of Civil Procedure 23(c)(1). *Ante*, at 12–13, n. 14. We did hold that "the collateral-order doctrine is not applicable to" a decertification order. 437 U. S., at 468–469. We then went on to reject the argument that the decertification order was final under the so-called "death knell" doctrine, holding that an order does not become final simply because the plaintiff will be unable to pursue his claim if the order stands. *Id.*, at 469–477. We declined to attach any importance to the fact that the plaintiff in *Coopers* was just as "effectively out of court" as Idlewild or Mercury. We noted that "if the 'death knell' doctrine has merit, it would apply equally to the many interlocutory orders in ordinary litigation . . . that may have such tactical economic significance that a defeat is tantamount to a 'death knell' for the entire case." *Id.*, at 470. We also noted that 28 U. S. C. § 1292(b) provides for review

of certain nonfinal orders, and that the "death knell" doctrine circumvents its restrictions. 437 U. S., at 474–475. By ignoring this discussion and holding from *Coopers,* the Court has created an unjustified exception to § 1291.

The Court also states that the stay order in this case is appealable under *Cohen, supra.* It quotes the formulation of the *Cohen* collateral-order doctrine from *Coopers:*

> "[T]he order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." 437 U. S., at 468, quoted, *ante,* at 11–12.

The District Court's order did not "conclusively determine the disputed question" for the reasons stated above. The Court's assertion to the contrary, *ante,* at 12–13, is nothing short of sheer speculation about the state of mind of the District Judge. Such speculation is hardly the "practical rather than . . . technical construction"* of § 1291 contemplated by *Cohen, supra,* at 546. In *Cohen* itself, the District Court denied the defendant's motion to require the plaintiff to post a bond on the ground that the statute requiring the bond did not apply. That order "conclusively determined" the question whether a bond was required because no conceivable change of circumstances could affect the basis of the District Court's decision. In this case, any number of plausible events might have convinced the District Court that a necessary basis of its decision—that the state court would proceed promptly and fairly to adjudicate the issue of the existence of an agreement to arbitrate—no longer applied.

---

*As a practical matter, it is not at all clear to me that the Court of Appeals' course would have provided arbitration more quickly than that of the District Court, even if this Court had not granted certiorari. If the Court of Appeals was correct that this dispute is plainly arbitrable, there is no reason to expect that the state courts would not have resolved that issue in the 11 months during which the case was before the Court of Appeals.

Furthermore, I am not as certain as is the.Court that by staying this case the District Court resolved "an important issue." An issue should not be deemed "important" for these purposes simply because the court of appeals or this Court thinks the appellant should prevail. The issue here was whether the factual question whether there was an agreement to arbitrate should be adjudicated in a state or federal court. Unless there is some reason to believe that the state court will resolve this factual question wrongly, which the Court quite rightly disclaims, *ante*, at 26, I do not see how this issue is more important than any other interlocutory order that may place a litigant at a procedural disadvantage.

For these reasons, I do not believe the District Court's order was appealable. Interlocutory orders are committed by statute to the judgment of the district courts, and this Court ill-serves the judges of those courts and the overwhelming majority of litigants by devising exceptions to the statute when it believes a particular litigant has been wronged.

Given my view of appealability, I do not find it necessary to decide whether the District Court's order was proper in this case. I am disturbed, however, that the Court has sanctioned an extraordinary departure from the usual and accepted course of judicial proceedings by affirming the Court of Appeals decision on an issue that was not decided in the District Court.

The Court of Appeals ordered the District Court to enter an order compelling arbitration, even though that issue was not considered by the District Court. This Court has maintained the difference between appellate jurisdiction and original jurisdiction at least since *Marbury* v. *Madison*, 1 Cranch 137, 174–176 (1803) ("It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a case already instituted"). I do not understand how the Court can say that the Court of Appeals had discretion to perform a nonappellate act.

The Court relies on 28 U. S. C. § 2106, which provides that a court of appeals

"may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

This statute does not grant the courts of appeals authority to constitute themselves as trial courts. Section 4 of the Arbitration Act gives the Hospital a right to a jury trial. See *ante*, at 23, n. 27. By deciding that there were no disputed issues of fact, the Court of Appeals seems to have decided a motion for summary judgment that was not before it. This is the kind of issue that district judges decide every day in the ordinary course of business. It is not the kind of issue that courts of appeals determine. The Court of Appeals did have before it the memoranda filed in the District Court but, contrary to the Court's intimation, *ante*, at 29, this issue was not argued in the Court of Appeals. See 656 F. 2d 933, 948, n. 1 (1981) (Hall, J., dissenting) ("No one argued that this court should decide that issue").

There was no reason to believe that the District Court would not have acted promptly to resolve the dispute on the merits after being reversed on the stay. That judges of a court of appeals believe they know how a case should be decided is no reason for them to substitute their own judgment for that of a district judge without regard to the normal course of appellate procedure.

The judgment below should be vacated and the case remanded to the Court of Appeals with directions to dismiss the appeal for want of jurisdiction. Failing that, even if the Court is correct that the stay order was an error, the judgment should be reversed insofar as it decides the question of arbitrability, and the case should be remanded to the District Court for further proceedings under the Arbitration Act.