**INTERNATIONAL TALENT GROUP, INC., Plaintiff,**

v.

**COPYRIGHT MANAGEMENT, INC., Defendant.**

**No. 85 Civ. 5762 (DNE).**

United States District Court, S.D. New York.

March 3, 1986.

Karen Shatzkin, New York City, for plaintiff.

White & Case, New York City (P.B. Konrad Knake and Owen Pell, of counsel), for defendant.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Defendant has moved to stay this diversity action and to compel arbitration of the claims. Defendant's motion is hereby granted.

## BACKGROUND

Plaintiff, International Talent Group, Inc. ("ITG") is in the business of booking concert tours. Defendant Copyright Management, Inc. ("CMI") is a computer systems consultant. During the latter part of 1983 ITG and CMI discussed the installa-

tion of a new computer system at ITG. According to ITG, there were two agreements between ITG and CMI: an oral agreement to provide consulting services on the purchase of computer hardware ("hardware contract") and a written agreement relating to the licensing and design of software ("software contract"). The written "software contract" contains an arbitration clause.[1]

The complaint contains four claims. The first claim alleges a breach of the "hardware contract" by CMI. The second claim alleges fraud by CMI in obtaining the "hardware contract." The third and fourth claims seek rescission of the "software contract" based on CMI's possession of ITG trade secrets.

Defendant has moved to stay this action and compel arbitration of the four claims based on the arbitration clause in the "software contract."

## DISCUSSION

### SOFTWARE CONTRACT CLAIMS

Plaintiff seeks to invoke the court's equitable jurisdiction asserting in claims three and four that it is entitled to rescission of the "software contract." The precise basis of these claims is unclear. Plaintiff alleges that defendant is in possession of ITG trade secrets as a result of the contract. Plaintiff also asserts that there has been a substantial, material and wilful breach of the software agreement. Plaintiff seeks rescission to place it in the same position it held prior to entering the contract.

The inclusion of trade secret allegations in the complaint is puzzling. Wayne Forte, president of ITG, asserted that the equitable remedy of rescission is sought to "ensure the safeguarding of our proprietary procedures." Affidavit of Wayne Forte dated January 3, 1986 at ¶ 20. While equity may provide a remedy to prevent the disclosure of trade secrets in the form of an injunction, rescission would not appear to be an appropriate remedy for plaintiff's claims insofar as they involve trade secrets. *See Bridge C.A.T. Scan Associates v. Technicare Corp.*, 710 F.2d 940, 946 (2d Cir.1983); *N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 532 F.2d 874, 875 (2d Cir.1976). *See also Timely Products Corp. v. Arron*, 523 F.2d 288, 304 (2d Cir.1975) (damages awarded for unauthorized disclosure of trade secret). Plaintiff has not alleged facts such as the imminent disclosure of confidential information that would warrant the exercise of the court's equitable powers to prevent the dissemination of alleged confidential information.

If the claim for rescission is based on the breach of the agreement itself, the court's equitable jurisdiction would still not be called upon. Rather, plaintiff may seek rescission "at law" which would be within the scope of the arbitration agreement. Rescission "at law" is appropriate where the plaintiff has been defrauded or for simple contract breach. *See* D. Dobbs, Handbook on the Law of Remedies § 4.3, at 255 and § 4.8, at 293 & n. 6 (1973).

When viewed in their basic terms, plaintiff's claims regarding the "software contract" are for breach of contract and fraud, *see TAC Travel America Corp. v. World Airways, Inc.*, 443 F.Supp. 825, 828 (S.D.N.Y.1978) (examination of factual issues presented to determine whether claim labeled as a tort claim was in reality a breach of contract claim and therefore subject to arbitration); the same claims made regarding the "hardware contract" in

1. Paragraph 14 of the "Software License Agreement" reads as follows:

GOVERNING LAW: This agreement and performance thereunder shall be governed and construed in accordance with the laws of the State of Tennessee. Any and all proceedings relation [sic] to the subject matter hereof oth- er than equitable remedies shall be settled by arbitration in the State of Tennessee in accordance with the Rules the [sic] obainting of the American Arbitration Association and judgment upon the award rendered may be entered in any Court having jurisdiction thereof.

claims one and two.[2] These contract based claims would clearly be within the scope of the arbitration contract. Therefore claims three and four are stayed and all contract

2. The relevant portions of the complaint provide as follows:

### FIRST CLAIM

6. In or about September, 1983, ITG and CMI entered into extensive negotiations concerning ITG's desire to install a computer system that would replace the manual record-keeping and reporting and noncomputerized word processing required in the day-to-day performance by ITG of its business.

7. During these negotiations, ITG described to CMI the nature of ITG's business and the functions ITG required from a computer system.

8. ITG explained that the different tasks it performed were interrelated and interdependent. For example, in order to book a concert date, it was necessary to refer variously to tour control records, financial records, itineraries, and venue and artist availability records.

9. Among other functions, ITG explained that it required a system that included integrated electronic-mail and Telex capabilities. This was essential to ITG's intended use of a computer, as ITG told CMI, since ITG needed to transmit the computer-stored information directly to its clients via electronic communications.

10. To induce ITG to enter into a contract for CMI's services, CMI made numerous warranties and representations to ITG, including, without limitation the following:

11. CMI told ITG that CMI had expertise in evaluating, recommending, and installing computer systems.

12. CMI represented that it had prior knowledge and experience with all aspects of the entertainment industry, including particularly artist booking agencies like ITG.

13. CMI assured ITG that CMI fully understood ITG's needs and expectations regarding a computer system.

14. CMI represented that it could recommend appropriate hardware, and design a software program for it, that would fulfill ITG's needs.

15. In reliance on CMI's representations and warranties, ITG entered into an oral contract ("the hardware agreement") with CMI whereby CMI advised ITG regarding the hardware ITG should purchase and agreed to order the hardware, as ITG's agent, from a reputable supplier that would be chosen by CMI.

16. Thereafter, in or about January, 1984, based upon CMI's advice and recommendation and through CMI as its agent, ITG purchased a Datapoint computer system and related equipment from Olympia Data Systems, Inc., a company chosen by CMI.

17. From the time ITG commenced using the computer, in approximately June, 1984, up to and including the present, the computer system has failed to perform as required by ITG and promised by CMI.

18. During this time, in response to ITG's repeatedly expressed concerns over the apparent inadequacy of the computer, CMI continually represented that ITG's hardware was the appropriate choice to fulfill ITG's needs and that the inadequacies and defects ITG encountered in attempting to use the system could be corrected by minor revisions to the software programs.

19. ITG has since learned that the hardware ITG purchased on CMI's advice and recommendation is inadequate and incapable of accommodating the software programs that ITG requires to carry on its business in numerous ways, including without limitation the following:

20. Contrary to ITG's need and expectation, which was communicated to CMI, the hardware has not replaced, and cannot replace, the separate telecommunications equipment and typewriters ITG has historically used.

21. The system response time is laboriously slow, resulting in increased costs and reduced productivity.

22. Even when it has been mechanically functioning, the hardware has not permitted ITG to carry out its day-to-day tasks on the computer, as intended.

23. Contrary to CMI's express representation that the hardware would outdistance ITG's needs for years to come, ITG is already running out of space.

24. As a direct and proximate result of CMI's breach of the hardware agreement, ITG has sustained damages in the sum of at least $200,000, including incidental and consequential damages.

### SECOND CLAIM

25. ITG repeats and realleged the allegations contained in paragraphs 1 through 23 as if fully set forth herein.

26. The foregoing warranties and representations made by CMI to ITG were false, and CMI knew they were false when made.

27. CMI's misrepresentation was material, and ITG reasonably relied on them.

28. CMI's conduct, as above described, was wilful, wanton, and malicious.

29. As a direct result of CMI's misrepresentations, ITG has sustained damages in the sum of at least $200,000.

### THIRD CLAIM

30. ITG repeats and realleges the allegations contained in paragraphs 1 through 14 as if fully set forth herein.

31. Thereafter, in or about February, 1984, ITG entered into a written software license agreement with CMI (the "software agreement"), under which CMI undertook to supply certain software programs that it promised

based disputes regarding the "software contract" are referred to arbitration.

## HARDWARE CONTRACT CLAIMS

CMI asserts that the first and second claims which relate to the "hardware contract" are arbitrable because they are not part of a separate agreement, but are in fact part of the "software contract." Plaintiff asserts that the "hardware contract" and the "software contract" consti-

tute two separate agreements so that the arbitration clause of the "software contract" would not apply.

Defendant seeks to bring the "hardware agreement" within the scope of the "software agreement" arbitration provision based on a merger clause contained in the "software contract." The merger clause provides that the agreement "constitutes the entire agreement between the parties.

and warranted would accommodate ITG's business requirements.

32. The software programs to be produced for ITG, which were described in an addendum to the software agreement (identified as the "CM Systems Proposal"), were a system service program, a log program, a tour control program, and a tour reporting program.

33. The estimated delivery date for each and all of these software programs was May 1, 1984, as set forth in the agreement.

34. Long after the scheduled delivery date, not one of the software programs promised under the software agreement had been installed.

35. Thereafter, when CMI finally delivered software programs that is said were in fulfillment of its contractual undertaking, each of the programs were seriously defective and failed to meet ITG's needs.

36. In addition, contrary to ITG's need and expectation, which had been communicated to CMI, the software programs were not easily integrated into ITG's existing business operation and did not cross-reference information among files in the same way as ITG was doing manually.

37. During a period of many months, in response to ITG's repeatedly expressed concerns over CMI's failure to meet its contractual obligations, CMI made numerous "fixes" and revisions, which it warranted and promised to ITG would correct the material inadequacies that plagued the software systems it had delivered to ITG.

38. Not only did the revisions fail to render the software programs workable, but often the "fix" of one defect would create new defects in other aspects of the programs.

39. During this time, CMI continually represented to ITG that CMI was capable of supplying software programs that would allow ITG to transfer its operations to the computer ITG had purchased; that the inadequacies and defects ITG encountered in attempting to use the system could be corrected by uncomplicated, minor changes and revisions; and that ITG would have the fully functioning system it had contracted for in a reasonable period of time.

40. In fact, ITG has never received a fully functioning system; some of the programs CMI contracted to supply have never been functional, and others have been only partially and/or intermittently functional; and the continual "tinkering" with the programs by CMI has caused enormous disruption and financial loss to ITG.

41. CMI's failure to perform constitutes a substantial, material, and wilful breach of the software agreement.

42. CMI is incapable of delivering what ITG bargained for under the software agreement.

43. During the course of the parties' communications relating to CMI's performance of the software agreement, ITG conveyed valuable proprietary information and trade secrets to CMI, which CMI presently retains possession of by virtue of the parties agreement.

44. ITG has no adequate remedy at law.

45. By virtue of the foregoing, ITG is entitled to rescission of the software agreement and to be placed in the position it occupied prior to the making of the agreement.

### FOURTH CLAIM

46. ITG repeats and realleges the allegations contained in paragraphs 30 through 40 as if fully set forth herein.

47. The foregoing representations by CMI, as well as the representations set forth in paragraphs 10 through 14 hereof, were false.

48. Upon information and belief, CMI knew the foregoing representations were false when it made them.

49. CMI's misrepresentations were material, and ITG reasonably relied on them.

50. During the course of the parties' communications relating to CMI's performance of the software agreement, ITG conveyed valuable proprietary information and trade secrets to CMI, which CMI presently retains possession of by virtue fo the parties agreement.

51. ITG has no adequate remedy at law.

52. By virtue of the foregoing, ITG is entitled to rescission of the software agreement and to be placed in the position it occupied prior to the making of the agreement.

There are no other representations express or implied between the licensee [ITG] and licensor [CMI] with respect to the above identified program products to be furnished hereunder." The "Terms and Conditions" rider to the contract provides:

MODIFICATION: This contract constitutes the entire and exclusive Agreement and supersedes all previous communications, representations or agreements, either oral or written between Licensor and Licensee. No representations or statements of any kind made by any representative of Licensor, which are not stated herein, shall be binding on Licensor.

If, in fact, the two agreements are separate, a merger clause in one contract would not incorporate all prior dealings between the parties, but rather only those relating to the subject matter of the contract containing the merger clause. The court need not, however, determine whether the software and hardware contracts are separate. The "software contract" arbitration clause applies to "[a]ny and all proceedings relation [sic] to the subject matter hereof." Thus, even if they are separate, the hardware contract would be subject to the arbitration provision in the "software contract" if it relates to the subject matter of the "software contract." Defendant contends that the "hardware contract" does relate to the subject matter of the "software contract."

■ An arbitration clause covering claims "relating to" a contract is broader than a clause covering claims "arising out of" a contract. *See Mobil Oil Indonesia, Inc. v. Asamera Oil (Indonesia) Ltd.,* 487 F.Supp. 63, 65 (S.D.N.Y.1980); *see also Acevedo Maldonado v. PPG Industries,* 514 F.2d 614, 616 (1st Cir.1975). The court must determine whether the "hardware contract" dispute relates to the subject matter of the "software contract."

The facts alleged by plaintiff and the claims contained in the complaint themselves must be examined to determine if a relationship exists between the claims. The "software contract" and the "hardware contract" involve the same overall word processing, communications and bookkeeping system at ITG. *See* Affidavit of Wayne Forte dated January 3, 1986 at ¶¶ 5, 8. The software described in the software licensing agreement was intended to be used in the hardware purchased as a result of the consultation provided for in the "hardware contract." *See id.* ¶ 8. Finally, Plaintiff's claims relate to the inadequacy of the system as a whole to satisfy their needs. *See, e.g.,* Complaint ¶¶ 6, 7, 9, 11, 13, 14, 19, 20, 21, 35, 39, 40. Consequently, the claims regarding the two agreements are intertwined. For example, the inadequacies in the system may be caused by the hardware or the software or both. Thus, it is not clear that the two agreements, if in fact separate, can be separated for purposes of resolving the claims raised in the complaint.

■ Finally, in determining whether a particular dispute is covered by an arbitration agreement, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983).

■ At the very least, the claims regarding the hardware's inadequacy "relate" to the software and therefore fall within the scope of the arbitration agreement. Claims one and two are therefore also stayed and referred to arbitration.

## CONCLUSION

Defendant's motion to stay this action and refer the matter to arbitration is granted.

SO ORDERED.