**FIRST UNION NATIONAL BANK OF FLORIDA, Plaintiff,**

v.

**MARGO FARMS DEL CARIBE, INC., Defendant.**

Civ. No. 92–1206 (JP).

United States District Court,
D. Puerto Rico.

Feb. 2, 1995.

Mario L. Paniagua Guzmán, San Juan, PR, Jacqueline D. Novas Debien, Dept. of Justice, Federal Litigation Div., San Juan, PR, for plaintiff.

Francisco A. Besosa, Miguel J. Rodríguez Marxuach, Axtmayer, Adsuar, Muñiz & Goyco, San Juan, PR, for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it plaintiff's motion to stay the proceedings (docket No. 92), defendant's opposition (docket No. 94), and the respective supplements to these motions. First Union National Bank of Florida ("First Union") initiated this action against Margo Farms del Caribe, Inc. ("Caribe") to foreclose assets which Caribe offered as a guarantee on a loan to its parent corporation, Margo Nursery Farms, Inc. ("Margo Nursery"). Caribe then filed a counterclaim alleging that First Union had tortiously interfered with Caribe and Margo Nursery's business transactions. A parallel action for the collection of monies from Margo Nursery, filed before the case at bar, is being litigated in Florida State Court. First Union subsequently amended the Florida action to include Caribe, and Caribe answered by including in the Florida action the counterclaim filed in this action. Due to the perfect identity of issues and parties between the Florida and the present action, the plaintiff requests the Court to stay this action until the parallel litigation in Florida is completed. For the reasons set forth below, the motion to stay is hereby **GRANTED**.

## I. Background

Margo Nursery obtained a loan from Southeast Bank in excess of four million dollars ($4,000,000.00), for which it pledged its land, plant inventory, as well as other assets in Miami, Florida, as collateral for the loan.[1] Southeast Bank also obtained guarantees on the loan from different entities affiliated with Margo Nursery, including Caribe, one of Margo Nursery's subsidiaries. Caribe offered to Southeast Bank its plant inventory, land, and accounts receivable in Puerto Rico as collateral for Margo Nursery's loan. First Union is now the owner of the loan made to Margo Nursery after it acquired the loan from the Federal Deposit Insurance Corporation, in its capacity as receiver for Southeast Bank.

Margo Nursery encountered serious financial difficulties and was therefore unable to pay its debt to First Union. The financial difficulties stemmed from the fact that the Margo entities (Margo Nursery and Caribe) used a fungicide called Benlate which they bought from E.I. DuPont De Nemours & Company ("Dupont"). This fungicide destroyed the Margo entities' plant inventories in Miami and Puerto Rico. Since Dupont's fungicide destroyed the plants, Margo Nursery asked Dupont to assist the Margo entities by providing them with payments that would cover operating costs, including loan

---

1. For consistency and clarity the Court will reference the parties in this litigation as they appeared in the initial action filed with the Court. However, the Court is aware of the December 1992 merger which changed the names of the Margo entities. Until January 22, 1993, Margo Farms del Caribe, Inc. was a subsidiary of Margo Nursery Farms, Inc. On that date, however, Margo Farms del Caribe, Inc. became the parent company of Margo Nursery Farms, Inc., changed its corporate name to Margo Nursery Farms, Inc., and the former Margo Nursery Farms, Inc. changed its name to Margo Bay. As a result, even though Margo Bay is the principal alleged debtor of First Union National Bank of Florida, it is now a subsidiary of Margo Nursery Farms, Inc.

payments. By August of 1991 Margo Nursery told Dupont that it was in default on the First Union loan. Margo Nursery and First Union attempted to renegotiate a payment plan that would be acceptable to both parties. Negotiations, however, proved unsuccessful.

On December 20, 1991, First Union filed an action in Florida State Court against Margo Nursery for recovery of monies and foreclosure of collateral.[2] The lawsuit also included other entities which secured the loan for Margo Nursery, but it did not include Caribe as a defendant at that time. On March 9, 1992, Margo Nursery filed a counterclaim against First Union for tortious interference with its business transactions in the Florida action. On January 23, 1992, First Union filed a foreclosure action in Puerto Rico Superior Court against Caribe, the guarantor of the loan to Margo Nursery, in order to maximize the possibility that it would be able to enforce a judgment against Caribe if Margo Nursery could not repay the loan. The case was removed from the Puerto Rico Superior Court to this Court pursuant to 12 U.S.C. § 632, which grants district courts of the United States original jurisdiction over all civil suits involving banking transactions in an insular possession of the United States. Caribe then filed a counterclaim against First Union in this action alleging that First Union tortiously interfered with the Margo entities' dealings with Dupont, and that this interference had a negative economic effect on the Margo entities. The counterclaim filed by Caribe in this action is identical to the counterclaim filed by Margo Nursery against First Union in the Florida State Court. By the time that Caribe filed its counterclaim in this Court the Margo entities had settled their damage claims with Dupont and received a total of Twenty–Two Million Five Hundred Thousand Dollars ($22,500,000.00). In essence, Caribe argued in its counterclaim that but for First Union's interference in the settlement negotiations with Dupont the Margo entities could have obtained a larger settlement from Dupont. As part of the settlement agreement between Dupont and the

Margo entities, Four Million Dollars ($4,000,-000.00) are being held in an escrow account in Miami in order to settle any judgments that First Union might obtain against the Margo entities.

On March 17, 1993, First Union amended its complaint in the Florida action in order to include Caribe and the counterclaim brought by Caribe in Puerto Rico. After filing against Caribe in Florida, First Union requested the stay of the proceedings in this action. First Union argues that the only reason it filed the present action is the fact that it needed to obtain jurisdiction over Caribe's assets in Puerto Rico. Since Margo Nursery now has enough assets to satisfy any possible judgment against it, and since the issues brought forth by Caribe's counterclaim are already being litigated in the Florida action, First Union claims that Florida is the best place to try all claims between the parties. Therefore, First Union maintains that this action should be stayed pending the outcome of the Florida litigation. Caribe opposes First Union's request, and simply argues that this action, once begun in Puerto Rico, should be litigated in Puerto Rico.

## II. The *Colorado River* and *Moses Cone* Doctrines

■ The parties agree on the applicable standard that will decide the motion for stay: the *Colorado River* and *Moses Cone* doctrines. Both doctrines, established in two different Supreme Court cases, begin with the presumption that federal courts have an obligation to exercise their jurisdiction once an action has been initiated. Therefore, federal courts will exercise their jurisdiction unless special circumstances dictate a different result. *Colorado River* and *Moses Cone* established the special circumstances under which federal courts can refrain from exercising their jurisdiction. A review of these two doctrines is in order.

■ In *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the

---

**2.** This is the date provided by First Union, who initiated the action. In Margo's opposition to the motion to stay (docket No. 94), it is claimed

that First Union initiated the suit on September 23, 1991. The discrepancy in the dates is not material for purposes of this Opinion and Order.

Supreme Court established a doctrine governing the stay or dismissal of federal lawsuits for situations in which the three traditional abstention doctrines are inapplicable. *Id.* at 817, 96 S.Ct. at 1246.[3] This alternative doctrine focuses not on considerations of state-federal comity or on avoidance of constitutional decisions as in the traditional abstention doctrines, but rather on "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246 (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)).

In *Colorado River* the State of Colorado enacted legislation which divided the state into seven Water Divisions, created to settle water claims on a continuous basis. The United States decided to seek the adjudication of reserved water rights in one of the seven divisions and filed suit in federal district court against some water users on behalf of itself and certain Native American tribes. One of the defendants decided to file suit in a state court, claiming that federal law gave state courts the power to join the United States in any adjudication of water rights. The district court granted, in an unwritten opinion, defendant's motion to dismiss the government's federal suit on abstention grounds in deference to the state court. The Court of Appeals for the Tenth Circuit reversed, holding that the district court had jurisdiction over the suit, and that abstention was inappropriate. The United States Supreme Court granted certiorari, reversed the Court of Appeals, and held that although the traditional factors for abstention were not applicable to the case, other factors had to be taken into account in order to determine whether a dismissal or stay would be appropriate. The Court listed four conditions which, if satisfied, would counsel against a federal court's exercise of jurisdiction: (i) a *res* is involved in the litigation and another

court has already exercised jurisdiction over it; (ii) the federal forum is inconvenient; (iii) staying or dismissing the suit would avoid piecemeal litigation; and (iv) jurisdiction was obtained in the state forum first. *Colorado River,* 424 U.S. at 818–19, 96 S.Ct. at 1246–47. In accordance with these factors, the Court held that the dismissal of the federal action was appropriate.

The Supreme Court modified the *Colorado River* doctrine in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1982), by adding two more factors to the previous four, namely: (i) whether state law controls the action, and (ii) whether the state forum will adequately protect the interests of the parties. *Id.* at 25–26, 103 S.Ct. at 941–42. In *Moses Cone* a hospital entered into a construction contract in which any disputes with the contractor would be referred to an architect, and problems with the architect's decisions would be subject to binding arbitration. The construction company made claims for extended overheads expenses due to the hospital's delay or inaction. The architect failed to resolve these claims, and the hospital refused to pay. The hospital then filed suit in a North Carolina state court seeking a declaratory judgment to establish that no right to arbitration existed, that it was not liable to the construction company, and that even if it were, it would be entitled to indemnity from the architect. The construction company subsequently filed a diversity action in federal district court, seeking an order to compel arbitration under Section 4 of the United States Arbitration Act. Pursuant to a motion to stay filed by the hospital, and finding that the *Colorado River* factors were present, the district court stayed the action pending the conclusion of the state action. The court of appeals reversed, and remanded the case with instructions to enter an order to arbitrate claiming that the four factors

---

3. The three abstention doctrines discussed by the United States Supreme Court apply under the following circumstances: (i) where a federal court can avoid constitutional determinations by allowing a state court to construe a state law (*Pullman* abstention); (ii) where the case involves difficult questions of state law whose im-

portance transcends the result of the case at bar (*Burford* abstention); and (iii) where federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings (*Younger* abstention). *Colorado River,* 424 U.S. at 814–16, 96 S.Ct. at 1244–46.

listed in *Colorado River* required for a stay were not met.

The Supreme Court granted certiorari and affirmed the decision of the court of appeals. The Court emphasized that the purpose behind the *Colorado River* doctrine is to determine whether exceptional circumstances exist in a case which would favor making an exception in the exercise of federal jurisdiction. Finding no special circumstances to support granting the stay, and focusing on the fact that federal arbitration law controlled the action with the added concern that the state court might not be as knowledgeable in federal arbitration matters, the Court decided that a stay should not be granted. The Court also counseled in its holding that the decision "whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case...." *Id.* at 16, 103 S.Ct. at 937.

## III. *Colorado River* and *Moses Cone* at Work

The Court of Appeals for the First Circuit, upon reviewing the *Colorado River* doctrine, has repeatedly noted that the Supreme Court itself "took care to emphasize its narrowness." *Villa Marina Yacht Sales v. Hatteras Yachts ("Villa Marina I")*, 915 F.2d 7, 12 (1st Cir.1990); *see also Rojas–Hernández v. Puerto Rico Electric Power Authority*, 925 F.2d 492 (1st Cir.1991); *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts ("Villa Marina II")*, 947 F.2d 529 (1st Cir.1991). In the *Villa Marina* cases, which upheld the dismissal of the federal action, the Circuit Court explained:

> Because federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them," *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246, the Court held that the surrender of jurisdiction in favor of "wise judicial administration" is permissible only in "exceptional" circumstances, *id.* at 818, 96 S.Ct. at 1246.
> Thus, while "the general principle [in an overlap between two federal courts] is to avoid duplicative litigation," *id.* at 817, 96 S.Ct. at 1246, the pendency of an over-

lapping state court suit is an insufficient basis in and of itself to warrant dismissal of a federal suit. Because "[o]nly the clearest of justifications will warrant dismissal," *id.* at 819, 96 S.Ct. at 1247, the circumstances permitting a district court to dismiss a case under the *Colorado River* doctrine "are considerably more limited than the circumstances appropriate for abstention," *id.* at 818, 96 S.Ct. at 1246.

*Villa Marina I*, 915 F.2d at 12. "To ensure that dismissals occur only in exceptional circumstances, the district court must weigh the relevant factors 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Villa Marina II*, 947 F.2d at 532 (quoting *Moses Cone*, 460 U.S. at 16, 103 S.Ct. at 937).

■ In spite of the narrow interpretation accorded to the *Colorado River* and *Moses Cone* doctrines, and after weighing the factors listed above and considering the exceptional circumstances present in this case, the Court finds that this case presents the necessary circumstances which counsel in favor of a stay. An examination of the independent factors is in order.

### A. Jurisdiction Over the Res

The first factor to consider is whether a *res* is involved in the litigation and another court has already exercised jurisdiction over it. The dispute in this action centers around a loan agreement and the assets offered as collateral for the loan. Therefore, the *res* in dispute is the money loaned under the agreement, which equals Four Million Dollars ($4,000,000.00), and any assets which guaranteed this amount of money. The Florida State Court already assumed jurisdiction over Two Million Dollars ($2,000,000.00) from Margo Nursery which have been deposited in the registry of the Florida State Court. Caribe claims that Margo Nursery received the Two Million Dollars from an insurance company for damages suffered during Hurricane Andrew, and that this money is not at issue. Caribe therefore concludes that this factor is inapplicable to the case at hand. The Court disagrees. Margo Nursery might owe money to First Union pursuant to the loan agreement, and if it does not successfully defend

itself against First Union's claims it will have to pay the money from whatever assets Margo Nursery might have, including money which it obtained from an insurance company. Only if those assets are not enough will Caribe have to respond for Margo Nursery's obligations under the loan.

Besides the Two Million Dollars ($2,000,000.00) held by the Florida State Court, Margo Nursery received Twenty Two Million Five Hundred Thousand Dollars ($22,500,000.00) from Dupont as a settlement for the damages caused by the fungicide Benlate. From that settlement the Margo entities are holding Four Million Dollars ($4,000,000.00) in an escrow account in Miami, Florida, to be paid on any final judgment regarding any liability of Margo Nursery or Caribe on the First Union loan. The Florida State Court could easily obtain jurisdiction over the money which Margo Nursery is holding in Florida in addition to the Two Million Dollars which it already controls. The sums of money located in Florida are more than enough to cover the obligations incurred under the loan agreement. Therefore, the fact that the Florida Court has jurisdiction over Two Million Dollars and could easily obtain jurisdiction over another Four Million Dollars weighs in favor of granting the stay.

## B. Inconvenience to the Federal Forum

The second factor to consider is whether it is inconvenient for the federal forum to hear the case. More than a mere concern for inefficiency in the administration of justice, this factor deals with a balancing of specific problems which a federal court is likely to experience if it handles a particular case. For example, "[i]n raising this factor, the [Supreme] Court seemed to be concerned with the physical proximity of the federal forum to the evidence and witnesses." *Burns v. Watler*, 931 F.2d 140, 147 (1st Cir. 1991) (quoting *Villa Marina I*, 915 F.2d at 15). Consideration of this factor entails, by necessity, a comparison between the problems which the federal forum will experience

as opposed to the problems encountered by the state forum.

First Union alleges that in answer to First Union's interrogatory for all witnesses with knowledge of the issues in the lawsuit, Caribe listed eleven (11) witnesses, nine (9) of which live in Florida. These are the same witnesses listed in the Florida action except for the addition of the former employees of the Margo entities who were recently listed by Margo Nursery as having their business and home addresses in Miami.[4] Caribe has not rebutted First Union's assertions except to make a blanket statement to the effect that many witnesses are in Puerto Rico. The Court fails to see why any significant number of material witnesses would be in Puerto Rico.

The actions at issue in this case occurred in Florida; i.e. the contract was signed in Florida. The loan agreement and the documents which evidence the existence of the loan were entered into in Florida and should physically exist in Florida. The alleged breach of said agreement occurred in Florida. Caribe now claims, without submitting any evidence, that because of a company merger Margo Nursery is now a subsidiary of Caribe, and that therefore the entities' documents are located in Puerto Rico. The Court is not convinced by this general and blanket statement. If the alleged relocation of some documents to Puerto Rico after the initiation of legal proceedings due to a change in corporate structure were determinative in this case, we would open the door to forum shopping by the simple movement of evidence; an unacceptable manipulation of our legal system. Due to the fact that witnesses, documents, and transactions are located or occurred in Florida, it would be inconvenient for the Court to hear this case in Puerto Rico. In particular, the Court is most concerned about the great number of witnesses, most of which reside in Florida, who would be forced to come to Puerto Rico for trial. The inconvenience to the federal forum supports granting the stay.

---

4. First Union alleges that of the thirty three (33) present and past employees, accountants, and attorneys of the Margo entities, almost all are located in Florida and their depositions will be taken there.

## C. Piecemeal Litigation

The third factor concerns the desire to avoid piecemeal litigation. "[I]n considering whether the concern for avoiding piecemeal litigation should play a role in this case, the district court must look beyond the routine inefficiency that is the inevitable result of parallel proceedings to determine whether there is some exceptional basis for requiring the case to proceed entirely in the Commonwealth [state] court." *Villa Marina I,* 915 F.2d at 16.

The action against Margo Nursery and its entities was filed in Florida, but it did not include Caribe as guarantor of the loan because Caribe's assets, which served as security for Margo Nursery's loan, were located in Puerto Rico. Therefore, the Florida State Court would not have had jurisdiction over them. First Union filed the instant action in Puerto Rico simply to obtain jurisdiction over the assets which Caribe offered as collateral for the loan. After Margo Nursery received the Twenty Two Million Five Hundred Thousand Dollars from Dupont, the need to maintain the suit in Puerto Rico against Caribe became almost non-existent since the assets held by Margo Nursery in Florida are more than adequate to cover First Union's claims against Margo Nursery. The action before the Court is therefore duplicative for purposes of resolving the claims between the parties. In essence, conducting this litigation in two forums is not only inefficient, but in this case unnecessary.

Litigating the issues before the Court certainly qualifies as piecemeal litigation, and yet continuing with the case in this forum would go beyond the routine inefficiency which results from parallel proceedings. This forum is certainly at a disadvantage when compared to the Florida State Court where all the events, documents, and witnesses either occurred or are present. Furthermore, it would be convenient and effective to litigate the claims against Caribe, as well as Caribe's counterclaim, in the court in which the rest of the suit is being litigated. Having the entire action before one court could shed light on subtleties which should be taken into account and which could be necessary in order to make a fair decision.

Taking into account these facts, the Court finds that continuing with the case in this forum would go beyond the usual disadvantages of piecemeal litigation. Again, this factor weighs in favor of the granting of the motion to stay.

## D. The Order in Which the Suits Were Filed

The fourth factor to consider is whether the action was brought in state court first. On December 20, 1991, First Union filed its action against Margo Nursery in Florida. This action did not include Caribe as a defendant. First Union subsequently filed the action before the Court against Caribe on January 23, 1992. Finally, First Union amended its action in Florida to include Caribe on March 17, 1993. Caribe alleges that the relevant dates to be considered by the Court are the dates in which the suits against Caribe ·were filed in Puerto Rico and in Florida, January 23, 1992, and March 17, 1993, respectively. However, this argument ignores the reality of the situation. The dates that the Court must take into consideration are the filing of the original suit in Florida against Margo Nursery, which is December 20, 1991, and the date in which the suit was filed in Puerto Rico against Caribe, which is January 23, 1992. The suit before this Court does not stand alone. Rather, the suit against Caribe in Puerto Rico is a ramification of the Florida action. In fact, the cause of action presented in this action is the same one that was presented earlier in Florida; the collection on a debt owed to First Union. Therefore, the original suit was initiated and meant to be litigated in Florida, and the action before this Court was filed for the sole purpose of obtaining jurisdiction over assets which guaranteed the loan.

Moreover, the trend in the First Circuit has been to interpret this factor as one which asks not only which action originated first, but which action is further along in the judicial proceedings. *Villa Marina II,* 947 F.2d at 535. This Court finds that taking into account the breadth and complexity of the action in Florida, the Florida action is much more advanced in its proceedings than the action before this Court. The parties in

Florida have had the opportunity to argue various motions before the Florida State Court and the Court has resolved many of these issues. Other hearings have already been scheduled and discovery is proceeding accordingly on all claims. This Court is certainly not as far into the proceedings as the Court in Florida. Other than dealing with the current motions, this Court has only held one Status Conference. Furthermore, before this action was transferred to this Court the parties had not progressed much further than the Initial Scheduling Conference since the dates for pretrial and trial had been set aside. Therefore, this factor weighs in favor of granting the motion to stay.

### E. What Law Controls the Action

The fifth factor deals with whether state law controls the action. This condition has been greatly refined and narrowed. The Supreme Court noted that "the presence of federal-law issues must always be a major consideration weighing against surrender," but only in "rare circumstances [will] the presence of state-law issues weigh in favor of that surrender...." *Moses Cone*, 460 U.S. at 26, 103 S.Ct. at 942. The First Circuit Court of Appeals has also noted that rare circumstances exist only when a case presents "complex questions of state law that would best be resolved by a state court." *Villa Marina I*, 915 F.2d at 15 (quoting *American Banker's Ins. Co. v. First State Ins. Co.*, 891 F.2d 882, 886 (11th Cir.1990)). In this case Florida State law controls, but this fact does not weigh in favor of granting the motion to stay since no rare circumstances dealing with difficult or unresolved aspects of state law exist. However, no issues of federal law need to be decided either. This factor is therefore neutral to both sides of the argument with regards to the stay.

### F. Adequacy of State Forum

The sixth factor deals with whether the state forum will adequately protect the interests of the parties. The test for this factor is whether the state court is inadequate to protect plaintiff's rights, so that the federal suit should not be dismissed. *Accord Moses Cone*, 460 U.S. at 26–27, 103 S.Ct. at 942–43.

There is no reason to doubt that the state forum can and will adequately protect the interests of both parties. In fact, the proceedings in Florida might protect the interests of the parties more efficiently since the action in Florida includes all the intricacies of the relationship between First Union and the Margo entities. The Florida State Court is simply better situated to determine the facts and the reasons for the parties' actions. Furthermore, Caribe does not contest the fact that the Florida Court is both willing and able to protect the interests of both parties. This factor weighs in favor of granting the stay.

### IV. Balancing of the Factors

All factors included in both *Colorado River* and *Moses Cone*, with the exception of the controlling law factor, weigh heavily in favor of granting the motion to stay. Furthermore, the counterclaim brought by Caribe against First Union in this action should be litigated in Florida and not in Puerto Rico because the analysis presented demonstrates that the Florida State Court is better prepared to handle the issues before this Court. First Union is trying to collect on a debt incurred in Florida which the Margo entities refuse to pay for various reasons. The issues all developed in Florida, the transactions (including the signing of the documents in which Caribe became a guarantor for Margo Nursery) took place in Florida, and the suit against the Margo entities was filed in Florida first. The only tie that this Court has to the action is that First Union filed a suit in Puerto Rico in order to foreclose on assets which were located in Puerto Rico. If First Union wants to stay its claims against Caribe in Puerto Rico, it should be able to do so in light of the particular facts of this case. First Union should not be forced to litigate an isolated issue which no longer needs to be litigated in Puerto Rico, and which was incorporated in the suit in Florida where it rightfully belongs. Furthermore, the issues presented by Caribe in its counterclaim before this Court have already been included in the Florida action. Equity, law, and reason dictate that this action be stayed.

## V. Conclusion

After having taken into account the factors enumerated in *Colorado River* and *Moses Cone,* the Court **FINDS** that the overall balance weighs heavily in favor of granting the motion to stay. Therefore, the motion to stay is hereby **GRANTED.** Any other pending motion not in accordance with this Opinion and Order is hereby **DENIED.**

Once the judgment of the Florida State Court becomes final and unappealable, the Court will examine whether any issue pending before the Court is still unresolved. The Court will then act accordingly.

IT IS SO ORDERED.