UNITED COMMUNICATIONS HUB, INC., a California corporation, Plaintiff—Appellee,

v.

QWEST COMMUNICATIONS, INC., a Delaware Corporation; Touchamerica, Inc., a subsidiary of Montana Power Company, a Montana corporation, Defendants—Appellants.

No. 01–56742.

D.C. No. CV–01–04371–ABC.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 2002.

Decided Aug. 23, 2002.

As Corrected Sept. 24, 2002.

Before T.G. NELSON, PAEZ, and TALLMAN, Circuit Judges.

MEMORANDUM*

Qwest Communications, Inc. (Qwest) appeals the district court's denial of Qwest's motion to compel arbitration and its grant of United Communications Hub, Inc.'s (UCHub's) motion for a preliminary injunction and stay of arbitration. The district court concluded that Qwest's allegations against UCHub did not relate to invoices or balances, subjects requiring arbitration under the parties' Wholesale Services Agreement (Agreement). Because we conclude that nine of Qwest's allegations do relate to invoices or balances and must therefore be arbitrated, we reverse.

We review the district court's denial of Qwest's motion to compel arbitration de novo.[1] Similarly, the meaning of an agree-

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.

1. *United Food & Commercial Workers Union, Local 770 v. Geldin Meat Co.,* 13 F.3d 1365, 1368 (9th Cir.1994).

ment to arbitrate receives de novo review.[2] The district court's grant of the preliminary injunction receives review for abuse of discretion.[3] However, legal issues underlying the district court's grant of the injunction are reviewed de novo.[4]

We reject UCHub's extremely narrow interpretation of the Agreement's mandatory arbitration clause. The narrow subject matter identified by the mandatory arbitration clause—invoices and balances—is somewhat countered by the remainder of the clause, which contains broad terms. The clause uses the phrase "relating to," which has a broad and inclusive meaning.[5] Thus, read as a whole, the clause indicates that matters relating to (a broad term) a fairly narrow set of subjects (invoices and balances) must be arbitrated.

Contrary to UCHub's assertions, nothing in the clause itself, or in the remainder of the Agreement, implies that disputes relating to invoices and balances will be only small, "run-of-the-mill" matters. To the contrary, we would presume that matters meriting the time and expense of arbitration, because they cannot be resolved by long-term contracting partners on their own, would not be small.

In order to apply our interpretation of the mandatory arbitration clause to this case, we must characterize the allegations in the complaint. Our reading of the complaint differs somewhat from the district court's. According to our reading, UCHub's complaint alleges that Qwest breached the Agreement, as well as federal and state law, by:

| Allegation | | Claim # |
|---|---|---|
| (a) | failing to provide timely and accurate Call Detail Records (CDRs); | 1,3,4,5,10,11,19 |
| (b) | billing UCHub at rates other than those agreed to; | 1,3–5,10–12 |
| (c) | billing UCHub amounts that are not due and owing; | 1,3–5,10–12 |
| (d) | failing unreasonably to provide telecommunications services to UCHub at a price that is available to Defendants and/or Defendants' other customers; | 2 |
| (e) | failing unreasonably to provide billing data to UCHub for traffic delivered to the Qwest and/or Touchamerica network in a reasonable manner; | 2 |
| (f) | failing to correct billing errors; | 12 |
| (g) | failing to process orders for new service from UCHub's customers timely and accurately; | 1–5, |
| (h) | billing UCHub's customers directly; | 1,3,4,10,11,18,22 |
| (i) | wrongfully threatening to and terminating service to UCHub and its customers without adequate notice; | 1,3,4,10,11 |

**2.** *Wolsey, Ltd. v. Foodmaker, Inc.,* 144 F.3d 1205, 1211 (9th Cir.1998).

**3.** *Textile Unlimited, Inc. v. A..BMH & Co.,* 240 F.3d 781, 786 (9th Cir.2001).

**4.** *Foti v. City of Menlo Park,* 146 F.3d 629, 634–35 (9th Cir.1998).

**5.** *See Mediterranean Enters., Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir.1983).

(j) switching UCHub's customers to Defendants' networks improperly; — 1,10,11,18,21,22

(k) unreasonably failing to provide telecommunications services to UCHub of a type and/or quality that is available to Defendants and/or Defendants' other customers; — 2

(*l*) inducing breach of contracts with third parties; otherwise interfering with relationships with third parties through defamatory communications, etc. — 6–11,18

---

■ The above allegations fall into two categories: (1) allegations arising under the Agreement that clearly relate to billing or invoices, broadly construed, and that, therefore, must be arbitrated, and (2) allegations that do not arise under the Agreement or that do not relate to billing or invoices and that, therefore, need not be arbitrated.[6] For the following reasons, we conclude that allegations (a) through (f), as set out above, fall into the former category and that allegations (g) through (*l*) fall into the latter.

Allegation (a) relates to invoices. A CDR is a list of calls that allows the reader to determine which calls were made by which customer. Thus, they are a kind of invoice and, as the complaint alleges, were vital to UCHub's understanding of Qwest's bills (as well as to Qwest's own billing of its retail customers).

Allegations (b), (c), and (d) relate to billing. They involve claims that Qwest over-billed, by billing at rates that were too high and by overcharging.

Allegation (e), which involves Qwest's alleged failure to provide accurate invoices, relates directly to invoices. And allegation (f) overtly describes an alleged problem with Qwest invoices and the balances it claimed were due: Qwest's failure to correct billing errors. Accordingly, allegations (a) through (f) relate to invoices or balances and are arbitrable.

Allegation (g) involves services, not invoices or balances. UCHub alleges that Qwest did not process orders for new services to UCHub's customers in a timely manner. This clearly falls outside the scope of the mandatory arbitration clause.

Allegation (h) relates to balances and invoices, referring as it does to billing. However, it complains that Qwest billed UCHub's customers, something entirely outside the Agreement. Accordingly, although the allegation relates to the subjects of mandatory arbitration, it does not arise under the Agreement. Thus, it falls outside the scope of the mandatory arbitration clause. Allegations (j) and (*l*) relate to behavior that also falls outside the Agreement. In those allegations, UCHub alleges that Qwest interfered in its relationships with third parties by, among other things, inducing breaches of contract and transferring UCHub customers to Qwest's networks. Thus, those allegations also fall outside the scope of the mandatory arbitration clause.

Allegations (i) and (k) involve services. In allegation (i), UCHub claims that Qwest terminated services to UCHub's custom-

---

**6.** UCHub also alleged that Qwest fraudulently induced the Agreement by claiming to be able to bill accurately, provide services, etc., in several claims. UCHub does not raise that allegation on appeal, however, and appears to have abandoned it while still before the district court. Accordingly, we do not address that allegation.

ers, and threatened to do so, without adequate notice. And allegation (k) involves the claim that Qwest provided inferior service to UCHub.

Because allegations (a) through (f) fall within the mandatory arbitration clause, we must reverse. Section 3 of the Federal Arbitration Act compels courts to stay litigation of arbitrable issues[7] regardless of whether those issues intertwine with non-arbitrable issues and regardless of whether "piecemeal litigation" will result.[8]

■ The decision whether to stay the non-arbitrable issues, identified in allegations (g) through (*l*), pending arbitration rests with the sound discretion of the district court.[9] We note a preference for proceeding with the non-arbitrable claims when feasible,[10] and approve of the reasoning of another district court faced with determining whether to extend a stay to non-arbitrable issues or not. In *Simitar Entertainment, Inc. v. Silva Entertainment, Inc.*,[11] the district court offered the following guidance: "Expanding the stay, so as to encompass all of the nonarbitrable

claims in the case, is [only] appropriate where the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." [12]

For the foregoing reasons, we REVERSE the district court and REMAND for entry of a stay pending arbitration as to the arbitrable claims and to allow the district court to exercise its sound discretion in determining whether or not to proceed in the interim with the non-arbitrable claims.

REVERSED and REMANDED.

---

7. 9 U.S.C. § 3.

8. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (rejecting refusal to grant § 3 stay where arbitrable issues intertwined with non-arbitrable ones, stating that the "preeminent concern of Congress in passing the [Federal Arbitration] Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate even if the result is 'piecemeal' litigation").

9. *Cf. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20–21 and n. 23, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (in context of staying claims of nonarbitrating parties).

10. *See, e.g., Dean Witter Reynolds*, 470 U.S. at 225 (J. White, concurring) (stating that "the heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course").

11. 44 F.Supp.2d 986 (D.Minn.1999).

12. *Id.* at 997 (citing cases).