COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.
2-05-140-CV

 

UBS FINANCIAL SERVICES, INC.                                          APPELLANTS

F/K/A
UBS PAINEWEBBER, INC.,

UBS
GLOBAL ASSET MANAGEMENT, INC., 

KORTNEY
PAUL, AND 

WILLIAM
RILEY 

                                                   V.

 

BILL BRANTON                                                                      APPELLEE

 

                                              ------------

 

           FROM
THE 342ND DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

                                                 AND

                                              ------------

 NO.
2-05-156-CV

 

IN RE UBS FINANCIAL SERVICES, INC.                                     RELATORS

F/K/A
UBS PAINEWEBBER, INC.,

UBS
GLOBAL ASSET MANAGEMENT, INC., 

KORTNEY
PAUL, AND 

WILLIAM
RILEY 

                                              ------------

 

                                    ORIGINAL
PROCEEDING

 

                                              ------------

                                             OPINION

                                              ------------








This is a securities case in
which Bill Branton (ABranton@) sued UBS Financial Services., Inc. (f/k/a UBS PaineWebber, Inc.),
UBS Global Asset Management, Inc., and two UBS brokers, Kortney J. Paul and
William Riley (collectively AUBS,@ when
appropriate) for various causes of action arising out of brokerage agreements
entered into between Branton and UBS.

UBS filed a motion to compel
arbitration pursuant to five of the brokerage agreements signed by
Branton.  After two evidentiary hearings,[1]
the trial court denied UBS=s motion; the trial court=s denial order did not state a reason for the denial, and the court
did not make any findings or conclusions either in the order or in a separate
document.[2]








UBS filed an interlocutory
appeal, cause no. 2-05-140-CV, asserting arbitration is required under the
Texas Arbitration Act (TAA),[3]
and filed a mandamus proceeding, cause no. 2-05-156-CV, asserting arbitration
is required under the Federal Arbitration Act (FAA).[4]

We consolidated these
proceedings,[5]
issued an order in the mandamus proceeding staying all proceedings in the trial
court until the mandamus is disposed of, requested a response from Branton in
the mandamus proceeding, and heard oral argument in the consolidated
proceedings.

We conditionally grant UBS=s requested relief in the mandamus proceeding because we hold the
trial court abused its discretion in denying UBS=s motion to compel arbitration under the FAA.  We dismiss the appeal as moot. 

                                          BACKGROUND








In 2000 and 2001, Branton
opened several accounts with PaineWebber, Inc. (APaineWebber@), which was
subsequently acquired by UBS.  On
November 19, 2003, Branton filed suit against UBS.  The crux of Branton=s claim is that the UBS defendants recommended unsuitable investments
for Branton, who subsequently lost $1 million of his $1.8 million
investment.  Specifically, Branton
alleged breach of fiduciary duty, fraud (statutory and common law), negligent
misrepresentation, negligent hiring, and gross negligence.

Based on five account
documents signed by Branton, UBS moved to compel arbitration under either the
FAA or the TAA and to stay all proceedings in the trial court.

Branton responded to the
motion to compel arbitration, asserting numerous objections to the formation,
enforceability, and scope of the arbitration agreement.  Branton=s basic argument is that although the boilerplate language of the
account documents requires arbitration under the FAA, there was no mutual
assent to the terms of the documents and the arbitration provisions are
unenforceable.  Branton testified that
when he signed these documents, all of the personal information was blank, and
when he later received copies of the documents in the mail from his PaineWebber
broker, the blanks had been filled in. 
Branton also claims he never received a copy of the Master Account Agreement
referenced in one of the account documents, Exhibit 2, and which requires
arbitration under the FAA.

In this combined appellate
proceeding, UBS asserts the right to compel arbitration based upon three of
those account documents, Exhibits 2, 4, and 5. 

 








                  JURISDICTION OF THE MANDAMUS PROCEEDING  

A denial of an application to
compel arbitration under the TAA is appealable. 
Tex. Civ. Prac. & Rem. Code
Ann. ' 171.098(a)(1)
(Vernon 2005).  In Texas, a trial court=s denial of arbitration under the FAA may be challenged only by
mandamus and not by interlocutory appeal. 
In re D. Wilson Constr. Co., 196 S.W.3d 774, 779 (Tex. 2006)
(orig. proceeding); Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 272
(Tex. 1992) (orig. proceeding); see 9 U.S.C. '' 1-16.  But a party may seek to
enforce an arbitration agreement under both the FAA and TAA if the agreement
does not say whether the FAA or TAA applies. 
In re D. Wilson Constr. Co., 196 S.W.3d at 778-79.  Texas appellate courts have jurisdiction over
interlocutory appeals from the denial of arbitration under the TAA only or
under both the FAA and TAA.  Tex. Civ. Prac. & Rem. Code Ann. ' 171.098 (a)(1); In re D. Wilson Constr. Co., 196 S.W.3d
at 778-79.








The FAA Aextends to any
contract affecting commerce, as far as the Commerce Clause of the United States
Constitution will reach.@  In
re Nexion Health at Humble, Inc., 173 S.W.3d 67, 69 (Tex. 2005) (orig.
proceeding).  All the parties agree that because the
transaction between UBS and Branton involves parties from different states and
UBS=s business affects interstate commerce, this case must be analyzed
under the FAA.  The record reflects that
the parties reside in or are headquartered in different states,[6]
the contract between the parties pertains to securities transactions that
involve interstate commerce,[7]
and two of UBS=s account
documents, Exhibits 2 and 5, clearly state that disputes will be resolved under
the FAA.[8]  Accordingly, we agree with the parties that
the dispute between the parties involves arbitration under the FAA; therefore,
we will address the merits of our mandamus jurisdiction first.  See In re D. Wilson Constr. Co., 196
S.W.3d at 780.

           PROVING ENTITLEMENT TO ARBITRATION
UNDER THE FAA








Because this transaction is
governed by the FAA, mandamus is an appropriate remedy to enforce the
agreement.  See Jack B. Anglin Co.,
842 S.W.2d at 272.  Mandamus relief is
available when a trial court erroneously denies a motion to compel arbitration
under the FAA.  In re Dillard Dept.
Stores, Inc., 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding); In re
FirstMerit Bank, N.A., 52 S.W.3d 749, 753-54 (Tex. 2001) (orig.
proceeding).

Section 2 of the FAA Aembodies a clear
federal policy of requiring arbitration unless the agreement to arbitrate is
not part of a contract evidencing interstate commerce or is revocable >upon such grounds
as exist at law or in equity for the revocation of any contract.=@  Perry v. Thomas, 482 U.S. 483, 489,
107 S. Ct. 2520, 2525 (1987).  Federal and state law strongly favor arbitration.  See Moses H. Cone Mem. Hosp. v. Mercury
Constr. Corp., 460 U.S. 1, 24‑25, 103 S. Ct. 927, 941 (1983); Prudential
Sec., Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995) (orig.
proceeding).  The FAA establishes that,
as a matter of federal law, any doubts concerning the scope of arbitrable
issues should be resolved in favor of arbitration, whether the problem at hand is
the construction of the contract language itself or a defense to
arbitrability.  Moses H. Cone Mem.
Hosp., 460 U.S. at 24‑25, 103 S. Ct. at 941.








A party attempting to compel
arbitration must establish a valid arbitration agreement whose scope includes
the claims asserted.  In re Dillard
Dept. Stores, Inc., 186 S.W.3d at 515; In re AdvancedPCS Health L.P.,
172 S.W.3d 603, 605 (Tex. 2005) (orig. proceeding).  Under the FAA, an agreement to arbitrate is
valid if it meets the requirements of the general contract law of the applicable
state.  In re Advanced PCS Health, 172
S.W.3d at 606.  Once the proponent of
arbitration establishes the existence of an arbitration clause governing a
dispute, the burden shifts to the opponent to raise an affirmative defense to
arbitration.  Id. at  607. 
The defenses must specifically relate to the arbitration portion of the
contract, not the contract as a whole, if the defenses are to defeat
arbitration.  In re RLS Legal
Solutions, LLC, 221 S.W.3d 629, 630 (Tex. 2007) (orig. proceeding); In
re FirstMerit Bank, 52 S.W.3d at 756.

Under the FAA, absent
unmistakable evidence that the parties intended the contrary, it is the courts
rather than arbitrators that must decide Agateway matters@ such as
whether a valid arbitration agreement exists. 
In re Weekley Homes, L.P., 180 S.W.3d 127, 130 (Tex. 2005) (orig.
proceeding).  A trial court=s determination of the arbitration agreement=s validity is a legal question subject to de novo review.  J. M. Davidson, Inc. v. Webster,  128 S.W.3d 223, 227 (Tex. 2003). 

 

 

 

 

 

 

 








                         THE ACCOUNT DOCUMENTS
AT ISSUE

UBS contends that Exhibits 2,
4, and 5[9]
were signed by Branton and require arbitration under the FAA.  The evidence shows that Branton signed
Exhibits 2 and 4 when he opened his account with PaineWebber, and that he
signed Exhibit 5 at a later date when he applied for a line of credit.[10]  These exhibits are pre-printed forms with
blanks that are to be filled in with various personal information about the
customer, including the account number, customer name, address, social security
number, financial information, and investment objectives.








        Exhibit 2 is entitled A[Ac]count Application@ and was signed by Branton on October 17, 2000.[11]  The application contains blanks to be filled
in pertaining to the account holder. 
These blanks include the account holder=s address, phone number, social security number, date of birth, number
of dependents, federal tax bracket, bank reference, marital status, and gender.
There is a question asking if the applicant is a PaineWebber employee or is
related to a PaineWebber employee.  Under
the Financial Information section there are blanks asking for AWorth (exclusive of residence),@ AAssets,@ and AIncome.@[12]  The application also has
blanks for the number of years that the account holder has had experience
investing in equities, bonds, futures, or options.  Under the AAccount Investment Objectives@ portion of the application, the account holder is asked to select
whether his AReturn
Objective@ is current
income, capital appreciation, or current income and capital appreciation.  Also under this section is a ARisk Profile,@ and the
account holder is asked to select a primary and secondary profile from the
following options:  conservative,
moderate, or aggressive/speculative.

Above Branton=s signature is a long paragraph that includes the following wording:








NING BELOW,
I ACKNOWLEDGE AND AGREE: . . . 2. that in accordance with the last
paragraph of the Master Account Agreement entitled [illegible],@ I am
agreeing in advance to arbitrate any controversies which may arise with
PaineWebber in accordance with the terms outlined therein. . . .[13]

 

Attached to this document is a printed AMaster Account Agreement.@  The final section of the Master Account
Agreement pertains to arbitration (this paragraph is the same in Exhibits 2, 4,
and 5):

ARBITRATION

 

$                  
Arbitration is final and binding on the
parties.

 

$                  
The parties are waiving their right to
seek remedies in court, including the right to jury trial.

 

$                  
Pre-arbitration discovery is generally
more limited than and different from court proceedings.

 

$                  
The arbitrator=s award
is not required to include factual findings or legal reasoning and any party=s
right to appeal or to seek modification of rulings by the arbitrators is
strictly limited.

 

$                  
The panel of arbitrators will typically
include a minority of arbitrators who were or are affiliated with the
securities industry.

 








Client
agrees, and by carrying an account for Client the Firm agrees that, any and
all controversies which may arise between the Firm, any of Firm=s
employees or agents and Client concerning any account, transaction, dispute or
the construction, performance or breach of this or any other agreement, whether
entered into prior, on or subsequent to the date hereof, shall be determined
by arbitration.  Any arbitration
under this agreement shall be held under and pursuant to and be governed by
the Federal Arbitration Act, and shall be conducted before an arbitration
panel convened by the New York Stock Exchange, Inc. or the National Association
of Securities Dealers, Inc.  
[Emphasis added.]

 

The section continues with various other
provisions relating to arbitration. The Master Account Agreement does not have
a place for the customer to sign, and is therefore not signed. 

Exhibit 5 is entitled APAINEWEBBER CREDIT LINE GUARANTY AGREEMENT@ and was signed by Branton on May 24, 2001.  At the top of the preprinted form are blanks
to be completed regarding the title of the AAccount being Guaranteed (Credit Line Account)@ and the title of the AGuarantor/Collateral Account Name.@  There is a blank for the
number of the branch, account number, and broker. The text of section 14 of the
document itself (not an attachment) contains the full arbitration paragraphs
quoted above. 








Exhibit 4 is entitled ATraditional IRA Application And Adoption
Agreement@ and was
signed by Branton on October 17, 2000. 
Above his signature is wording that is quoted in UBS=s mandamus petition as requiring arbitration; however, much of this
wording is illegible on the original exhibit, even when examined with a strong
magnifying glass.  The mandamus petition
states that the illegible wording recites that by signing the document, Branton
acknowledges that he has received and read the Customer Agreement Disclosure
Statement and the Master Account Agreement for IRAs.  Attached to Exhibit 4 is a AMaster Account Agreement For IRAs.@  This latter document contains the same
arbitration paragraph as is quoted above in Exhibit 2; the document does not
have a place for the customer to sign, and is therefore not signed.

Because much of the wording
directly above Branton=s signature
on the original of Exhibit 4 is entirely illegible,[14]
we cannot say that by signing this document Branton agreed to be bound by the
terms of the attached Master Account Agreement For IRAs.  Therefore, 
Exhibit 4 does not entitle UBS to proceed to arbitration and we will not
discuss it further in this opinion.

                                THE EVIDENTIARY HEARINGS








Dawn Carter, a Divisional
Vice President with UBS and an employee of its predecessor PaineWebber, filed
an affidavit in support of UBS=s motion to compel arbitration. 
She stated that Exhibits 1-5 are true and correct copies of the
documents Branton signed to open his accounts, and A[i]t was the regular course of business for PaineWebber to provide
copies [of] these applications and agreements to Mr. Branton after he signed
them.@  Branton was the only witness
to testify at the March 5, 2004 hearing. 
He stated that after his broker, Kortney Paul, moved from A.G. Edwards
to PaineWebber, Branton met with Paul and another broker, William Riley, at
their office.  They advised Branton that
they had Adifferent
policies and procedures that would be advantageous for me to open an account
with them.@  Several weeks later Paul brought Exhibits 2
and 5 to Branton=s house for
him to sign so that Branton could open an account; the personal identifying
information on the documents was blank. 
Branton stated that he did not read anything in the documents and was
never told about the arbitration clauses. 
When he received copies back from PaineWebber, the blanks had been
filled in.  He claims he did not receive
a copy of the Master Account Agreement referenced in Exhibit 2 until much later
when another UBS broker contacted him and asked him to sign new account
agreements.[15]


















At the February 25, 2005
hearing, Branton=s wife
testified that when  Paul came by their
house with the documents for her husband to sign, Branton signed the
documents.  She did not read the account
applications and when asked if there was handwriting on the documents when she
saw them, she acknowledged that she could not recall whether there was any
handwriting on the documents.  When asked
if Paul explained any aspects of any arbitration agreement, she replied, ANot in my memory.@  She stated that after Branton
signed the forms, Paul took them with him and did not leave any copies with the
Brantons.  She acknowledged that she does
not open the mail that comes to their home from PaineWebber, so if a Master
Account Agreement had been received in the mail, she would not have known it.  Paul testified by video deposition taken ten
days before the February 25, 2005 hearing.[16]  He stated that he had been a securities
dealer with A.G. Edwards, at which time Branton was his client.  Paul left A.G. Edwards to work at UBS as a
securities dealer, and Branton subsequently became his client at UBS in
2000.  Paul left UBS prior to Branton
filing the current lawsuit; he no longer works in the securities field.  Paul testified that the accounts he opened
for Branton at UBS were the same types of accounts that Branton had at A.G.
Edwards.  Paul agreed that he took the
UBS account documents to Branton=s house to be signed, and  told
Branton the documents needed to be signed because a client had to have a
completed account application to open up an account with UBS. Paul stated that
Exhibits 2 and 5 were account applications that were signed by Branton to open
his accounts.[17]  Paul did not recall whether the blanks in the
applications were filled out at the time Branton signed the applications, but
stated it would not be standard procedure to have somebody sign a  document that did not have the blanks filled
out.  Paul acknowledged that the
handwriting in the blanks on Exhibit 2 is his own, and that the handwriting in
the blanks on Exhibit 5 is his and his assistant=s.  Paul testified that UBS=s standard procedure was to complete all the information either before
meeting with the client, or during the meeting with the client.  He could not specifically recall whether the
documents were completed at the time Branton signed them, but stated that it
would be Aunusual@ to have a document signed by a client in blank.  Paul testified that it was standard practice
that if the client wanted to look through the documents and ask questions, Paul
would answer them.  However, Branton did
not have any questions about the account documents when he signed them. Paul
said that it was standard procedure for his assistant at UBS to mail the
customer a copy of whatever document had been signed, along with any
attachments, including the Master Account Agreement.

                                           DISCUSSION

Two separate documents,
Exhibits 2 and 5, require any controversy between UBS and Branton to proceed to
arbitration under the FAA.  Whether these
provisions are binding turns on the validity of Branton=s defense that there was no obligation to arbitrate the claims because
there was no meeting of the minds when Branton signed the documents.  Branton contends the documents are not
binding upon him because there was missing personal information that was later
filled in by UBS and this missing information includes material terms necessary
to create a meaningful contract, and because UBS failed to timely provide him
with the Master Account Agreement that was attached to Exhibit 2.[18]









UBS responds that the
contracts are binding because the information was already filled in at the time
of signing by Branton, or even if the missing personal information was filled
in by UBS after Branton signed the documents, the information had been provided
by Branton and was filled in with his permission, and the missing information
was not relevant to whether the arbitration clause was binding on Branton.  UBS also contends that Branton=s defenses to the contract pertain to the entire contract, not to the
arbitration clause in particular; therefore, UBS asserts that under the
separability doctrine the defenses cannot defeat arbitration and the defenses
can be arbitrated.  We agree with UBS=s latter assertion. 

Any defenses to the contract
brought by Branton must specifically relate to the arbitration clause itself,
not the contract as a whole, if they are to defeat arbitration. See In re
FirstMerit Bank, N.A., 52 S.W.3d at 756.  Defenses that pertain to the entire contract
can be arbitrated.  See id.  Because the law favors arbitration, the
burden of proving a defense to arbitration is on the party opposing
arbitration, in this case Branton.  See
id.








Branton does not dispute that
he signed Exhibits 2 and 5.  Obviously,
the parties dispute whether there were any blanks in the forms at the time they
were signed by Branton.  While the terms
that Branton contends were omitted from and later inserted into the forms could
be material to the merits of his claim, they relate to the contract as a whole,
not specifically to the preprinted language regarding arbitration.  Branton=s defenses to the contract thus pertain to the entire contract, not to
the arbitration clause in particular; therefore, under the separability
doctrine the defenses cannot defeat arbitration and the defenses can be
arbitrated.  See In re FirstMerit Bank,
N.A., 52 S.W.3d at 756.








In addition, a contract may
validly and expressly incorporate by reference arbitration language of another
referenced document.  See In re
D. Wilson Constr. Co., 196 S.W.3d at 781 (AInnumerable contracts are consummated every day in Texas that
incorporate other documents by reference. 
A contractual term is not rendered invalid merely because it exists in a
document incorporated by reference, . . . and we agree with the
courts of appeals that arbitration‑related language is no exception to
this rule.@ (internal
citation omitted)).  Immediately above
Branton=s signature on Exhibit 2 is the statement Athat in accordance with the last paragraph of the Master Account
Agreement . . . I am agreeing in advance to arbitrate any
controversies which may arise with PaineWebber in accordance with the terms
outlined therein.@  This statement alerted Branton that Exhibit 2
incorporated an agreement to arbitrate that was in the Master Account
Agreement.  See In re Dallas
Peterbilt, Ltd., L.L.P., 196 S.W.3d 161, 162-63 (Tex. 2006) (orig.
proceeding) (holding that employee=s signature acknowledging he had been provided with and carefully read
or been given the opportunity to read separate six-page summary requiring
arbitration of work-related claim constituted effective notice because it
unequivocally provided employee with knowledge of the arbitration agreement,
notwithstanding employee=s claim that
he did not receive the summary and was unaware of arbitration
requirement);  In re McKinney, 167
S.W.3d 833, 835 (Tex. 2005) (orig. proceeding). 
By signing a contract, a party is presumed to have read and understood
its contents.  See In re Prudential
Co. of Am., 148 S.W.3d 124, 134 (Tex. 2004) (orig. proceeding).[19]  Accordingly, UBS met its initial burden of
establishing that a valid arbitration agreement exists between UBS and Branton.








UBS also had the burden of
showing that the dispute falls within the scope of the arbitration
agreement.  See In re Dallas Peterbilt,
196 S.W.3d at 163.  Branton sued UBS for
various causes of action arising out of the brokerage agreements entered into
between Branton and UBS.  Exhibit 2
recites that by signing the document Branton acknowledged and agreed in advance
to arbitrate Aany
controversies which may arise with PaineWebber in accordance with the terms
outlined therein.@  The Master Account Agreement that is
referenced in Exhibit 2, recites that the client agrees that Aany and all controversies which may arise between the Firm, any of the
Firm=s employees or agents and Client concerning any account, transaction,
dispute or the construction, performance or breach of this or any other
agreement, whether entered into prior, on or subsequent to the date hereof@ shall be determined by arbitration. 
And Exhibit 5, the Credit Line Guaranty Agreement signed by Branton,
recites that the client agrees that Aany and all controversies which may arise between the parties herein
and the Firm concerning any account, transaction, dispute or the construction,
performance, or breach of this or any other Agreement, whether entered into
prior, on or subsequent to the date hereof@ shall be determined by arbitration. 
We conclude that the causes of action asserted by Branton in the
underlying suit against UBS all arise out of the relationship between Branton
and UBS that is encompassed within the scope of the arbitration provisions
listed in Exhibit 2, including the Master Account Agreement, and Exhibit 5.

Considering these
circumstances, the only decision that the trial court could have reasonably
reached was that Branton, by signing Exhibits 2 and 5, had consented to
arbitrate future disputes.  See Walker
v. Packer, 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding) (Aclear failure by the trial court to analyze or apply the law correctly
will constitute an abuse of discretion@).

 

 








                                           CONCLUSION

A party denied the right to
arbitrate under the FAA has no adequate remedy by appeal and is entitled to
mandamus relief.  In re AdvancePCS
Health L.P., 172 S.W.3d at 608; In re Wood, 140 S.W.3d 367, 370
(Tex. 2004) (orig. proceeding).  We
conclude that the trial court clearly abused its discretion in denying UBS=s motion to compel arbitration and stay the trial court
proceedings.  We conditionally grant
mandamus relief.  We have confidence that
the trial court will vacate its prior order and will grant UBS=s motion to compel arbitration under the FAA and stay the trial court
proceedings.  The writ of mandamus will
issue only if the trial court fails to do so. 
UBS=s
interlocutory appeal is dismissed as moot. 
See Tex. R. App. P.
43.2(f); In re D. Wilson Constr. Co., 196 S.W.3d at 784.

 

DIXON W. HOLMAN

JUSTICE

 

 

PANEL
B:  HOLMAN, GARDNER, and McCOY, JJ.

 

DELIVERED:  October 25, 2007

 

 

 

 

 

 











[1]The
hearings were held on March 5, 2004 and February 25, 2005.  After the first hearing, the trial court
ordered the parties to mediation, which was unsuccessful.





[2]Although
Branton=s
mandamus response states that Athe trial court found no
meeting of the minds, therefore, no contract,@ the
trial court did not make any findings or explanations in support of its denial
of UBS=s
motion to compel arbitration.





[3]See Tex. Civ. Prac. & Rem. Code Ann. ' 171.021
(Vernon 2005).





[4]See 9
U.S.C.A. '' 1-16
(West 1999 & Supp. 2007).





[5]See
In re Valero Energy Corp., 968 S.W.2d 916, 916-17 (Tex. 1998)
(orig. proceeding) (AWe
note for future cases that the better course of action for a court of appeals
confronted with an interlocutory appeal and a mandamus proceeding seeking to
compel arbitration would be to consolidate the two proceedings and render a
decision disposing of both simultaneously, thereby conserving judicial
resources and the resources of the parties.@).





[6]UBS
Financial Services, Inc. and UBS Global Asset Management, Inc. are
headquartered in New Jersey.  Kortney
Paul, William Riley, and Bill Branton are Texas residents.





[7]The
sale of securities affects interstate commerce. 
See Am. Med. Technologies, Inc. v. Miller, 149 S.W.3d 265, 269
(Tex. App.CHouston
[14th Dist.] 2004, no pet.)(combining mandamus and interlocutory appeal); In
re Merrill Lynch, Pierce, Fenner & Smith Inc., 131 S.W.3d 709, 712
(Tex. App.CDallas
2004, orig. proceeding).





[8]As
will be discussed infra, UBS=s Exhibit 4 cannot support
its request that the dispute between the parties be sent to arbitration.





[9]The
numerous documents allegedly signed by Branton appear in several places in the
clerk=s
record and some were entered into evidence at the two evidentiary
hearings.  As a result, the same document
may bear a different exhibit number depending upon where it is located in the
appellate record.  We ordered the
originals of UBS=s
Exhibits 2, 4, and 5 from the March 5, 2004 hearing on UBS=s
motion to compel be sent to this court as part of the consolidated appellate
record.  See Tex. R. App. P. 34.6(g)(2).  These are the three documents upon which UBS
relies in this appellate proceeding. 
Accordingly, we will refer to the three exhibits at issue by their
designation at the March 5, 2004 hearing: 
Exhibits 2, 4, and 5. 





[10]Branton
does not dispute that he signed these documents. 





[11]We
have closely examined the original of Exhibit 2 that was introduced in the
trial court.  This document is actually a
photocopy of the application that was signed by Branton. It appears that when
the original application was photocopied, a small portion of the entire
vertical left margin was omitted. Therefore, Exhibit 2 lacks several letters or
words in the left margin.  However, these
omissions do not affect the specific issue before us.  





[12]It is
probable that these are incomplete phrases; however, because the left margin of
the document is missing, we are unable to ascertain the exact wording of the
phrases.





[13]As
explained previously, because of the quality of the exhibit it is not possible
to ascertain the first word(s) of the quoted material or one of the words
within the quote. 





[14]UBS
also quotes language from Exhibit 4 which UBS says recites that by signing the
document Branton affirms that he has supplied all of the information contained
in the agreement and declared it to be true and correct. Some of this wording
is legible on the exhibit.  However, we
will not consider these fragments of sentences because the complete phrase or
sentence containing this wording cannot be ascertained from a close reading of
the original of Exhibit 4.





[15]
After UBS acquired PaineWebber, a UBS broker presented Branton with UBS=s
account forms and requested that Branton sign them.  Branton testified he did not sign the new
documents.





[16]The
court watched the deposition and the court reporter transcribed it. The actual
video deposition was not introduced into evidence.





[17]Paul
was asked about ADeposition
Exhibits@ 1
and 3.  There are no deposition exhibits
included in the appellate record. 
However, a review of Paul=s testimony indicates that
Deposition Exhibit 1 appears to be the same as Exhibit 2 referred to in our
opinion, and Deposition Exhibit 3 appears to be the same as Exhibit 5 referred
to in our opinion.





[18]However,
as stated earlier in this opinion, Exhibit 5 was signed by Branton and does not
purport to have any attachmentsCthe arbitration clause is
actually in the text of the document itself.





[19]Because
we reject this argument, we also reject Branton=s
argument that there was no valid contract because the Master Account Agreement
had not been Adelivered@ to
him.